**GENERAL STAR INDEMNITY CO., Plaintiff,**

v.

**SHERRY BROOKE REVOCABLE TRUST, et al., Defendants.**

**No. SA 99–CA–1105 WWJ.**

United States District Court, W.D. Texas, San Antonio Division.

Sept. 10, 2001.

Stephanie Lyn O'Rourke, Shaddox, Compere, Walraven & Good, San Antonio, TX, for General Star Indemnity Company, plaintiff.

Robert W. Wachsmuth, The Kleberg Law Firm, San Antonio, TX, Alicia J. Haff, Shelton & Valadez, P.C., San Antonio, TX, Bruce L. James, The Kleberg Law Firm, P.C., San Antonio, TX, Kristi Clarke, The Kleberg Law Firm, San Antonio, TX, for Sherry Brooke Revocable Trust, John C. Brooke Revocable Trust, Larry Woodman, Jr., Trustee, defendants.

Thomas Gerard Kemmy, Law Offices of thomas G. Kemmy, San Antonio, TX, for Stabilizing Technology of Texas, Inc.

Alicia J. Haff, Shelton & Valadez, P.C., San Antonio, TX, Bruce L. James, The Kleberg Law Firm, P.C., San Antonio, TX, Kristi Clarke, The Kleberg Law Firm, San Antonio, TX, for Sherry Brooke.

Bruce L. James, The Kleberg Law Firm, P.C., San Antonio, TX, Kristi Clarke, The Kleberg Law Firm, San Antonio, TX, for John C. Brooke.

## MEMORANDUM OPINION

JUSTICE, Senior District Judge.

On September 22, 2000, General Star Indemnity Company ("General Star") filed its Motions for Summary Judgment based on allocation, commencement, and the 14–day provision (Doc. Nos.91–93). On October 12, 2000, General Star filed its Motion for Summary Judgment as to Defendants' extra-contractual counterclaims (Doc. No. 107). On November 3, 2000, Sherry Brooke Revocable Trust, et. al., ("Brookes") filed their Responses to Plaintiff's Motion for Summary Judgment based on allocation, commencement, the 14–day provision, and as to Defendants' extra-contractual counter-claims (Doc. Nos. 128–131 and 133). On November 9, 2000, General Star filed replies to all of Brookes' responses (Doc. No. 136–138). On November 22, 2000, Brookes filed a supplemental response to all of General Star's replies (Doc. No. 142). On December 18, 2000, Brookes filed further supplemental responses (Doc. No. 146), to which General Star responded on December 28, 2000 (Doc. No. 148). On March 16, 2001 United States Magistrate Judge Pamela A. Mathy issued a report and recommended that each of General Star's foregoing motions for summary judgment be granted (Doc. No. 149). On April 2, 2001, Brookes filed their Objections to the Report and Recommendations (Doc. No. 151), followed on April 9, 2001 by their Brief in Support of Objections (Doc. No. 156). On April 20, 2001, General Star filed its Response to Defendants' Objections (Doc. No. 157), to which Brookes replied on April 30, 2001 (Doc. No. 158). The Court has carefully considered these pleadings, the report and recommendations, and the applicable authorities.

### FACTUAL SUMMARY

Brookes are the owners of the Sage West, Eldon Square and Casa Linda Apartment complexes in Corpus Christi, Texas. Brookes owned a commercial property insurance policy, issued by General Star, covering all three complexes. In conjunction with the proposed sale of the three apartment complexes in 1997, a real estate broker hired S.T.T.I. Construction, Inc., to inspect the property. The inspection (which took place in the "early or mid-fall of 1997") uncovered damage that was attributed by the inspector to possible plumbing leaks. A reinspection occurred in "December or January of 1998," with two licensed insurance adjusters determining that the damage likely was caused by plumbing leaks. In January of 1998, the general property manager notified Brookes' insurance agent of "building movement caused by plumbing leaks" at one of the complexes. A General Star adjuster visited the complex in question, and a week later, Brookes filed a notice of loss for all three complexes, which stated that the cause of the damages was "presently unknown." On July 1, 1998, Brookes filed proofs of loss with General Star for claims under the policy for damages to all three complexes. General Star rejected the proofs of loss as "insufficient" on July 8, 1998. On October 4, 1999, Brookes received correspondence from General Star, denying their claims. The instant dispute revolves around the question of whether the General Star insurance policy covers the damage to the three apartment complexes caused by the leaking pipes, and whether, apart from its duties under the

contract, General Star violated the Texas Deceptive Trade Practices Act ("DTPA"), article 21.21, § 16 of the Texas Insurance Code, and its common law duty of good faith and fair dealing.[1]

## STANDARD OF REVIEW

Absent objection or clear error, the Court may accept the recommendations of a United States Magistrate Judge in whole or in part. 28 U.S.C. § 636(b)(1)(A); F.R.C.P. 72(b). Where a party makes specific and timely objections to the Magistrate Judge's recommendations, the District Court must review *de novo* those portions of the Magistrate Judge's recommendation to which the party objects. *Id.*

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law underlying the claims in issue identifies which facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When assessing a

motion for summary judgment, the court must make all factual inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## DISCUSSION [2]

### I. *General Star's Motion for Summary Judgment (14–Day)*

■ The General Star insurance policy under which Brookes were covered is an "all risks" policy. It covers all risks associated with the covered property, unless excluded. General Star argues that the damages claimed by Brookes fall within the policy's exclusion that provides: "We will not pay for loss or damage caused by or resulting from any of the following: . . . Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more." Section B(2)(f). Brookes contend that they are afforded coverage in a separate promise to pay that is unaffected by the exclusion cited by General Star. To determine the validity of Brookes' argument, it is helpful to consider the competing provisions in the context of the policy. Section B contains the provisions relevant to the dispute. Section B is laid out as follows:

B. Exclusions

 1. We will not pay for loss or damage caused directly or indirectly by any of the following. . . .

---

1. The Court today deals only with General Star's motions for summary judgment as to the 14–day provision and Brookes' extra-contractual claims. As findings on the motions based on commencement and allocation are unnecessary to a disposition of this case, the Court makes none.

2. In addition to their specific objections, Brookes also object to the Magistrate Judge's "miscellaneous findings," generally asserting

that she improperly analyzed and assigned weight to Brookes' evidence and that she repeatedly misallocated the burden of proof. After reviewing the Magistrate Judge's report as well as the summary judgment evidence provided, the Court finds that the Magistrate Judge made no such errors. The Magistrate Judge's inquiry was properly guided by the relevant law, and she applied the appropriate standards.

2. We will not pay for loss or damage caused by or resulting from any of the following:

a.....

b....

c....

d. (1) Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

. . .

But if loss or damage by the "specified causes of loss" or building glass breakage results, we will pay for that resulting loss or damage.

e.....

f. Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more.

. . .

Brookes contend that while section B(2)(f) excludes damage to their property from the promise to pay for all risks, section B(2)(d) grants additional coverage beyond the scope of the original all risks policy. They further assert that even if section B(2)(d)(2) would apply to exclude Brookes' damages, because the foundation movement was indirectly caused by rust, corrosion, or deterioration of the complexes' pipes, nevertheless since water damage resulted from that rust, corrosion, or deterioration, General Star agreed to pay for the damage caused by the resulting water leak.[3] Brookes therefore insist that section B(2)(d) creates a separate promise to pay, independent of the all risks coverage.

The Magistrate Judge found that "[t]he 14–day clause in Brookes' policy unambiguously excludes from the policy any and all otherwise covered water damage when the loss occurs from '[c]ontinuous or repeated seepage or leakage of water that occurs over a period of 14 days or more.' The language and intent are clear." (Doc. No. 149 at 44–45). Brookes object that the Magistrate Judge "failed to follow persuasive authority from Texas appellate courts and binding authority from the Fifth Circuit Court of Appeals," namely: *Gehl v. State Farm Fire & Cas. Co.*, 214 F.3d 634 (5th Cir.2000), *Sczepanik v. State Farm Fire & Cas. Co.*, 211 F.3d 256 (5th Cir. 2000), *Burditt v. West Am. Ins. Co.*, 86 F.3d 475 (5th Cir.1996), and *Balandran v. Safeco Insurance Co. of America*, 972 S.W.2d 738 (Tex.1998) (Doc. No. 151 at 4). In addition, Brookes state that the Magistrate Judge's interpretation of the 14–day provision is "unconscionable" and impractical (Doc No. 156 at 17). Brookes urge on all the above grounds that the 14–day provision is inapplicable to their claims. In the event, however, that the Court finds the provision applicable, Brookes ask that the provision be construed as a notice provision, meaning that the provision would only exclude "damages resulting from seepage or leakage that is continuous or repeated for fourteen days or more after the leak or damage is discovered." (*Id.* at 23).

Because this case was brought under the court's diversity jurisdiction, Texas law shall be applied. *See Lynch Properties, Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir.1998). In determining coverage, a court must analyze the insurance contract itself. In construing a contract, a court's primary concern is to give effect to the intentions of the parties as expressed in the instrument. *See Cicciarella v. Amica Mutual Ins. Co.*, 66 F.3d 764, 768 (5th Cir.1995). All parts of the

---

**3.** Section B(2)(d) indicates that if damage by the "specified causes of loss" results, the insurance company will pay for that damage.

One of the specified causes of loss under the policy is water damage.

document must be construed together, giving effect to the intent of the parties. See *Id.*

When the language of the insurance policy is susceptible of more than one reasonable construction, the courts will apply the construction that favors the insured and permits recovery. *See Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex.1987); *Yancey v. Floyd West & Co.*, 755 S.W.2d 914, 918 (Tex.App.-Fort Worth 1988, writ denied). Where the disputed insurance clause involves exceptions or limitations to the policy, construction against the insurer even more stringent than usual is required. *See Yancey*, 755 S.W.2d at 918. However, the rules regarding construction in favor of the insured apply only in the event of an ambiguity. *Id.* A court should not strain to find such ambiguity if, in doing so, it defeats the probable intentions of the parties. *See Id.* "If an insurance policy is worded so that it can be given only one reasonable construction, it will be enforced as written." *Jimenez v. State Farm Lloyds*, 968 F.Supp. 330, 332 (W.D.Tex.1997).

The Court finds Brookes' legal and factual arguments unreasonable and unpersuasive. First, Brookes are in error in asserting that the Magistrate Judge failed to apply binding Texas and Fifth Circuit precedent. The Texas Supreme Court held in *Balandran* (the principles of which all of the cited cases follow) that the Texas homeowner's policy exclusion repeal provision "is subject to two reasonable interpretations, and is therefore ambiguous." 972 S.W.2d at 741. That court then interpreted the contract in favor of the insured. No such ambiguity exists in the commercial property policy before the Court. Considering an identical provision and an almost identical argument made by the insured, this Court recently stated that

the only reasonable interpretation of the exclusions in the General Star policy is

that damage resulting from rust or corrosion is excluded, except when damage by water damage results. Moreover, in all cases that damage occurs from the leakage or seepage of water over a period of 14 days or more, the damage is not covered—even if that leakage or seepage was caused by rust or corrosion.

*General Accident Insurance Co. v. Unity/Waterford–Fair Oaks, Ltd. v. General Star Indemnity Co.*, Civil Action No. SA–97–CA–624 (W.D.TX., Dec. 14, 2000), at 6. This interpretation is as sound now as it was then, and so the Court finds the 14–day provision applicable to Brookes' claims. Given the plain language of the policy, Brookes' reading is unreasonable. Furthermore, the *Balandran* line of cases is inapposite, as it is concerned with a different sort of provision in a different kind of policy-the Texas homeowner's policy.

The Court also rejects Brookes' alternative assertions that the exclusion is a) unconscionable, or b) a mere notice provision. There is nothing unconscionable about requiring due diligence on the part of the insured, or about excluding certain types of damages from the bargain struck between the insured and the insurer. Both are contemplated by this very contract. What is not contemplated is that this exclusion should be treated as a notice provision. The contract states in unmistakable, unambiguous language that the insurer "will not pay for loss or damage caused by or resulting from ... [c]ontinuous or repeated seepage or leakage of water that occurs over a period of 14 days or more." The provision means what it says, and Brookes' notice interpretation is unreasonable.

Brookes direct the Court to no evidence sufficient to give rise to a genuine issue of material fact, given the applicability of the 14–day provision. The Magistrate Judge

is correct that such evidence as is available indicates that the leaks in question had gone on for months before repair, and probably more. The Court accepts the Magistrate Judge's unobjected-to findings with respect to this issue. Because of those findings, as well as the Court's foregoing review of Brookes' objections, the Plaintiff's Motion for Summary Judgment (14–day) shall be, and is hereby,

**GRANTED.**

II. *General Star's Motion for Summary Judgment as to Brookes' Extra-contractual Counterclaims*

 Brookes assert counterclaims of bad faith delay, as well as related claims under the Texas Deceptive Trade Practices Act (DTPA) and Section 21.21 of the Texas Insurance Code. Brookes moves the Court to rule against General Star's motion for summary judgment (extra-contractual claims), regardless of whether the Court finds Brookes' contractual claims barred. The Magistrate Judge recommended that General Star's motion be granted as to all of the extra-contractual counterclaims. Brookes object that the Magistrate Judge

> failed to follow and/or correctly apply binding Fifth Circuit precedent in *Harbor Ins. Co. v. Urban Contr. Co.*, 990 F.2d 195, 202 (5th Cir.1993) and *First Texas Sav. Ass'n v. Reliance Ins. Co.*, 950 F.2d 1171, 1179 (5th Cir.1992), which hold that a proper denial of coverage does not automatically defeat a claim for breach of good faith in handling, processing and investigating the claim.

(Doc. No. 151 at 5). *Harbor* applies to the common law claim, *First Texas* to the statutory claims. Brookes read both cases appropriately to state that proper denial of a claim *does not automatically defeat a* claim for breach of the duty of good faith and fair dealing. What Brookes misread is the Magistrate Judge's report.

 In order to make out a claim for breach of the duty of good faith and fair dealing, it would be necessary for Brookes to meet the test articulated in *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210 (Tex.1988), that is:

(1) there is an absence of a reasonable basis for denying or delaying payment of benefits under the policy; and,

(2) the carrier knew or should have known that there was not a reasonable basis for denying the claim or delaying payment of the claim.

*Id.* at 213. Brookes' counterclaim simply cannot survive the first part of this test, and Brookes make only a cursory effort at arguing that it should. Brookes attempt to survive summary judgment by resting on mere allegations of bad faith, but point to no summary judgment proof of bad faith. In particular, they point to no summary judgment proof which would give rise to a genuine issue of material fact as to whether or not General Star's behavior in investigating and denying their claim was, in fact, unreasonable. The "general rule," to which both parties agree, is that "there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered." *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995). As previously discussed, Brookes' claims are not covered by the policy. Brookes hang their extra-contractual claims on a single line of *dictum* in *Stoker*, in which the Texas Supreme Court stated that it did not "exclude the possibility that in denying the claim, the insurer may commit some act, so extreme, that would cause injury independent of that claim." *Id.*

Brookes maintain that this is just such a case, that General Star took so much time to investigate and finally deny Brookes' claim as to constitute bad faith delay, regardless of the merit Brookes' claim under

the policy. General Star responds that Brookes cite to no Texas authority for the proposition that there even exists a tort of "unreasonable delay," and that, even if the Court were to conclude that such a tort does exist under Texas law, Brookes have failed to produce sufficient summary judgment proof to give rise to a fact issue of each of the tort elements-particularly causation and damages.

As the Magistrate Judge wrote in her report,

> [t]he "reasonable basis" for the denial of the claims includes the bona fide questions of allocation, commencement, the 14–day exclusion, the coverage of certain property and valuation of the claims—at no point had liability become reasonably clear. The "reasonable basis" for the delay (in the denial of the claims) comes from ongoing investigations conducted by both parties and the extensive nature of the claims on three apartment complexes with a total of 342 units and 80 buildings and a total claimed loss of $27,065,866. (Appendix to defendants' responses, vol. II, F.)

(Doc. No. 149 at 63).

Thus, the Magistrate did not find that Brookes' claim was automatically barred as not covered by the policy. What she found, under the *Aranda* test, is that Brookes had failed to come forward with sufficient summary judgment proof that General Star had no reasonable basis for denying or delaying payment of benefits under the policy (Doc. No. 149 at 63).

In support of their common law claim for bad faith, Brookes point to: a) the fact that Brookes filed their initial claim on January 14, 1988 (Doc. no 156 at 26); b) their claims were not denied until October 4, 1999; and c) their contention that the sum total of General Star's investigation was a visit from an adjuster in March of 1998, combined with interview undertaken the following January. *Id.* at 25–26. On

these facts, Brookes assert that "[u]nder the circumstances, General Star's delay in conducting its "investigation" and subsequently denying the claim raises a fact issue for the jury as to whether such denial was 'prompt' . . ." *Id.* at 26. In essence, then, all that Brookes have to support their claim of bad faith is the fact that it took a year and nine months for General Star to deny their claims. This allegation is not sufficient to raise a genuine issue of material fact. That Brookes can cite cases that refer obliquely to the possibility that there may be certain egregious circumstances under which a delayed rejection might constitute a violation of the common law duties of good faith and fair dealing (though none of those cases so hold under their own facts) does not mean their own claim should survive summary judgment.

 Even if the Court were to grant that a) there is such a tort as "bad faith unreasonable delay in denying a claim," and b) Brookes have provided sufficient summary judgment evidence on that question, Brookes have failed to provide any summary judgment evidence on causation or damages, a circumstance which, effectively, precludes their tort claims.

With the exception of the above *First Texas* argument, Brookes make no objection to the Magistrate Judge's legal and factual findings as to their statutory claims. The Magistrate Judge's unobjected-to findings with respect to these issues are accepted, as they are with respect to the common law claims. Because of those findings, in addition to the above-outlined review of the Defendants' objections, Plaintiff's Motion for Summary Judgment as to Defendants' extra-contractual counterclaims shall be, and is hereby,

**GRANTED.**

### CONCLUSION

For the foregoing reasons, General Star's Motion for Summary Judgment (14–

Day) and Motion for Summary Judgment (Extra-contractual Counterclaims) shall be, and are hereby,

**GRANTED.**

## REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE

MATHY, United States Magistrate Judge.

Pursuant to the order of referral in the above-styled and numbered cause of action to the undersigned United States Magistrate Judge [1] and consistent with the authority vested in United States Magistrate Judges under the provisions of 28 U.S.C. § 636(b)(I)(B) and rule 1(d) of the Local Rules for the Assignment of Duties to United States Magistrates, effective January 1, 1994, in the Western District of Texas, the following report is submitted for your review and consideration.

### I. JURISDICTION

Jurisdiction is based on diversity of citizenship. 28 U.S.C. §§ 1332 and 2201.

### II. PROCEDURAL HISTORY

Plaintiff, General Star Indemnity Company ("General Star" or "plaintiff") filed its original complaint on October 5, 1999, alleging that defendants Sherry Brooke, John C. Brooke, Larry Woodman Jr., Sherry Brooke Revocable Trust and John C. Brooke Revocable Trust ("Brookes" or "defendants"), the owners of three apartment complexes in Corpus Christi, Texas, had submitted notices of loss claiming that "serious signs of structural damage" were covered by a commercial property policy issued by General Star for the premises for the period of February 7, 1997 to February 7, 1998.[2] General Star sought a declaration that the losses were not covered.

On November 19, 1999 and prior to the filing of any answer, General Star filed its first amended complaint [3] and on August 14, 2000 General Star filed its second amended complaint, its "live" pleading in this case.[4] The second amended complaint requests the entry of a declaration that the losses alleged by the insured at the three locations "did not occur within the policy of General Star," that the losses are not within the terms and provisions of General Star's policy, and that there is "no coverage under the policy" for the alleged losses.[5] More specifically, General Star alleges that "there is no covered loss that occurred and/or commenced during the policy period" and "even if there was a loss during the policy period, there is no covered loss under the terms and provisions of the policy" and Brookes "have failed to comply with the conditions precedent in the policy."[6]

Brookes filed motions to dismiss, to which General Star responded, and an original answer subject to their motions.[7]

1. Docket no. 99.

2. Docket no. 1. Defendants themselves collectively refer to defendants as "Brookes."

3. Docket no. 3.

4. Docket no. 70. General Star sought to file a second amended complaint and a first amended answer to the counterclaim which purported to add no new claims, causes of action or transactions but which "revised" allegations "to fit the evidence more specifically." Docket nos. 50 at 1–2 and 52 at 1–2. Brookes did not object to the filing of these amended pleadings or file amended responsive pleadings.

5. Docket no. 70 at 12.

6. Docket no. 70 at 11–12, ¶ 18.

7. Docket nos. 2 (motion) and 6 (supplemental motion and answer); docket nos. 16 and 18 (response and supplemental response).

The District Court granted defendants Brookes' motions as to defendants Sherry Brooke Revocable Trust and John C. Brooke Revocable Trust, and denied the motions as to all other parties.[8]

On June 7, 2000, Brookes' filed its first amended answer and original counterclaim.[9] The counterclaim alleged that General Star: (a) violated the Texas Deceptive Trade Practices Act ("DTPA") by use of a "false, misleading and deceptive" act or practice, breach of an express or implied warranty, unconscionable acts and use of an act or practice in violation of article 21.21 of the Texas Insurance Code; (b) violated article 21.21, § 16 of the Texas Insurance Code by making knowing misrepresentations about coverage, failing to attempt a good faith settlement, failing to provide a prompt explanation of the basis for denial of the claim, denying the claim without a reasonable investigation, compelling Brookes to file a counterclaim, insulating itself from "bad faith liability" by filing this lawsuit and by investigating Brookes' claims "in a manner calculated to construct a pre-textual basis for denial of those claims;" (c) breached covenants of good faith and fair dealing; (d) committed negligence; (e) acted with malice; and (f) breached its contract of insurance with Brookes.[10] Brookes request actual damages, exemplary damages, court costs, attorneys fees and interest in connection with their counterclaims.[11]

General Star's answer and first amended answer to the counterclaim denied Brookes' counterclaims and raised affirmative defenses based on its policy of insurance with the Brookes.[12] More specifically, General Star alleged as affirmative defenses that: Brookes have not met all conditions precedent to making a claim under the policy; that the claims did not occur or commence during the relevant policy period; the "limits of insurance," deductible and coinsurance provisions of the policy limit any recovery; Brookes failed to comply with the duties required under the policy in the event of a loss or damage; the claims are excluded from coverage; the claims are limited by the policy; the claims are not covered or are barred by Brookes' failure to make prompt repairs; Brookes failed to state a claim under the DTPA because Brookes are not consumers under the DTPA, have

8. Docket no. 19.

9. Docket no. 40.

10. Docket no. 40 at 8–17. With respect to the breach of contract claim, Brookes argue that General Star breached its contract, express or implied, or, in the alternative and if General Star "seeks to avoid liability from the terms of the contract of insurance, then counter plaintiffs [Brookes] allege that the terms of the contract are ambiguous and should be strictly construed against counter defendant [General Star] and in the light most favorable to counter plaintiffs" (docket no. 40 at 17, ¶ 65).

11. Docket no. 40 at 18–19. On July 21, 2000, Brookes sought to amend their counterclaim to add a sentence that defendants had received correspondence on October 4, 1999 denying their insurance claims and to make an election of remedies between two types of damages which Brookes allege they are entitled to recover. General Star opposed the amendment arguing that there is no need to amend to add an evidentiary detail, such as the date of claim denial, and that Brookes are not entitled to the damages which they seek to elect. On October 2, 2000, the Court denied Brookes' motion to file a first amended counterclaim on the ground that the motion was filed after the deadline for amending pleadings and without deciding whether Brookes were entitled to damages under either theory discussed (docket no. 103 at 5). The same Order denied Brookes' motion to realign General Star as defendant, since dispositive motion had already been filed, but without prejudice to re-urging following the District Court's ruling on the dispositive motions (docket no. 103 at 6).

12. Docket nos. 41 and 72.

not alleged any facts to support the claim of bad faith or for damages or for punitive damages; there can be no cause of action for negligence since the contract determines the duties of the parties; and Brookes' claims are barred by the "known loss doctrine" or "fortuity doctrine" in that Brookes should have known that the problems existed before the policy began.[13] General Star requests recover of attorneys fees and court costs for defending against groundless claims brought under the DTPA and article 21.21 of the Texas Insurance Code.[14]

On or about September 22, 2000, General Star filed three motions for summary judgment, based on "allocation," "commencement," and "the fourteen-day clause."[15] On October 12, 2000, General Star filed a motion for partial summary judgment regarding the Brookes' extra-contractual claims.[16] In sum, in these four summary judgment or partial summary judgment motions, General Star argues that they are entitled to judgment as a matter of law as a result of the policy clause limiting coverage to loss commencing during the policy period;[17] the absence of evidence upon which a jury could allocate the damage attributed to covered perils;[18] the policy provides that "damage caused by 'the continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more' is excluded;"[19] there is no genuine issue of material fact that Brookes' extra-contractual counterclaims should be dismissed because there has been no violation of the contract,

General Star had a reasonable basis for denying Brookes' claims, there was no violation of the DTPA and Texas does not recognize a cause of action for negligent claims handling;[20] and, alternatively, that partial summary judgment should be entered to bar Brookes from recovering for damage to foundations, underground systems or pipes, costs associated with excavating, filling or backfilling and to limit Brookes' damages to the difference market value of the property on the date of loss and its value on that date if free from the covered damage.[21]

Brookes oppose each motion for summary judgment. In brief, Brookes argues that, with respect to the "commencement" motion, that Brookes is entitled to recovery for losses that manifested themselves during the policy period regardless of when the leaks commenced and that there is evidence that the damage occurred during the policy period.[22] With respect to the "allocation" motion, that there is no non-covered damage to segregate because the damage was produced by a "sole" cause.[23] With respect to the "fourteen-day clause" motion, Brookes argues, in sum, that a more specific clause of the policy providing that "[General Star] will pay" for damage from accidental discharge of water controls over the more general "fourteen-day" provision.[24] Brookes opposes summary judgment on its extra-contractual counterclaims, arguing that summary judgment is not appropriate because General Star failed to conduct an adequate

---

13. Docket no. 72 at 5–10.

14. Docket no. 70 at 10.

15. Docket nos. 91, 92 and 93.

16. Docket no. 107.

17. Docket no. 92.

18. Docket no. 91.

19. Docket no. 93 at 5.

20. Docket no. 107.

21. Docket no. 97.

22. Docket no. 133 at 8.

23. Docket no 129 at 6 and 9.

24. Docket no. 128.

investigation constituting bad faith, an exception to the general rule that there must be a contract violation, and because General Star impermissibly delayed in denying Brookes claim. Brookes represents that it withdrew its claim of negligent claims handling and, therefore, General Star's motion for summary judgment on negligence should be considered moot.[25] Finally, Brookes opposes partial summary judgment, arguing that the policy does not exclude foundation damage or the cost of replacing and accessing plumbing and the policy allows the insured to choose the preferred method of recovery.[26]

### III. STATEMENT OF FACTS

The following facts are not disputed between the parties, except when otherwise noted:

General Star issued Brookes a Texas Commercial Property Policy effective February 7, 1997 to February 7, 1998, insuring the Sage West, Eldon Square and Casa Linda Apartment complexes in Corpus Christi, Texas.[27] The three apartment complexes are comprised of a total of 342 units and 80 buildings.[28]

In conjunction with the proposed sale of the three apartment complexes in 1997, a real estate broker hired S.T.T.I. Construction, Inc. ("STTI") to inspect the property.[29] The inspection which occurred in "early or mid-fall of 1997" uncovered damage that was attributed by the inspector to possible plumbing leaks.[30] The real estate broker informed defendant John C. Brooke of the findings and referred Brooke to STTI for further assistance.[31] Brooke asked STTI to reinspect the property. A second inspection occurred in either "December of 1997 or January of 1998."[32] The two licensed insurance adjustors who performed the second inspection determined that the damage likely was caused by plumbing leaks.[33]

On January 14, 1998, the general property manager notified the insurance agent from whom the policy was purchased that there may be "building movement caused by plumbing leaks at Casa Linda."[34] On January 22, 1998, an adjuster for General Star inspected the Casa Linda property.[35] On January 28, 1998, Brookes filed a notice of loss for Sage West, Eldon Square and Casa Linda apartment complexes with General Star; the notice of loss generally described the damage and stated that the cause was "presently unknown."[36]

On March 12, 1998, an employee of STTI and the adjuster for General Star inspected all three properties.[37] According to Brookes, at the conclusion of the inspection, General Star's adjuster verbally denied Brookes' claims, however, when STTI issued an acknowledgment of the denial of the claim, General Star's adjuster responded in writing denying that a verbal

**25.** Docket no. 131 at 4.

**26.** Docket no. 130 at 4–7, 7–9.

**27.** Docket no. 91 at 1–2. The policy number was IAG–348552. The key portions of the policy cited in this report are set out in the Appendix to this report.

**28.** Docket no. 146 at 4 n. 5.

**29.** Docket no. 133 at 4.

**30.** Docket no. 133 at 4.

**31.** Docket no. 133 at 4–5.

**32.** Docket no. 133 at 5.

**33.** Docket no. 133 at 5.

**34.** Docket no. 133 at 5; appendix to defendants' responses, vol. I, B at 2.

**35.** Docket no. 133 at 5.

**36.** Appendix to defendants' responses, vol. I, B at 3–5.

**37.** Docket no. 133 at 6.

denial had been made.[38] On July 1, 1998, Brookes filed proofs of loss with General Star making claims under the policy for $1,383,938.00 on Casa Linda, $1,020,099.00, on Eldon Square, $4,395,560.00 on Sage West. Brookes filed an additional partial proof of loss for $46,822.70 on Sage West.[39] General Star rejected the proofs of loss as "insufficient" on July 8, 1998.[40] On October 4, 1999, Brookes received correspondence which denied their insurance claims.[41] From July 1998 to October 2000, the case remained active and continued communication occurred between the parties to resolve or address the claims.

## IV. *ISSUES PRESENTED*

1. Whether General Star's objections to Per Schneider's affidavit should be sustained, whether General Star's motions to strike the affidavits of Per Schneider, Bob Lampkin and Anastacio Martinez should be granted and whether General Star's objection to the Reliable Reports, Inc. report should be sustained.

2. Whether General Star is entitled to summary judgment as a result of the policy clause limiting coverage to loss or damage commencing during the policy period.

3. Whether there is no genuine issue of material fact that Brookes does not allocate between covered and non-covered damage, entitling General Star to summary judgment.

4. Whether General Star is entitled to summary judgment as a result of the policy clause excluding coverage for continuous or repeated seepage or leakage of water that occurs over a period of fourteen (14) days or more.

5. Whether General Star is entitled to partial summary judgment on its alternative grounds.

6. Whether General Star is entitled to summary judgment as to Brookes' extra-contractual counterclaims.

## V. *STANDARDS*

### A. Summary Judgment

The applicable standard in deciding a motion for summary judgment is set forth in FED. R. CIV. P. 56, which provides in pertinent part as follows:

> [T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[42]

Mere allegations of a factual dispute between the parties will not defeat an otherwise proper motion for summary judgment. Rule 56 requires that there be no genuine issue of material fact.[43] A fact is material if it might affect the outcome of the lawsuit under the governing law.[44] A dispute about a material fact is genuine if

---

**38.** Docket no. 133 at 6; appendix to defendants' responses, vol. I, B at 14 and 17.

**39.** Appendix to defendants' responses, vol. I, B at 29.

**40.** Appendix to defendants' responses, vol. I, B at 30, and 31.

**41.** Docket no. 87 at 4.

**42.** FED R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**43.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**44.** *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Thomas v. LTV Corp.*, 39 F.3d 611, 616 (5th Cir.1994).

the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[45] Whether plaintiff has raised an issue for trial, based on proving the elements of her *prima facie* case and presenting a fact issue as to the truth of defendants' offered reasons, is governed by the sufficiency of the evidence standard.[46] This standard provides that " '[t]here must be a conflict in substantial evidence to create a jury question.' "[47]

The movant on a summary judgment motion bears the initial burden of providing the court with a legal basis for its motion and identifying those portions of the record which it alleges demonstrate the absence of a genuine issue of material fact.[48] The burden then shifts to the party opposing the motion to present affirmative evidence in order to defeat a properly supported motion for summary judgment.[49] All evidence and inferences must be drawn in favor of the party opposing summary judgment.[50] However, " '[m]ere conclusory allegations are not competent summary judgment evidence, and they are therefore, insufficient to defeat or support a motion for summary judgment.' "[51] Thus, summary judgment motions permit the Court to resolve lawsuits without the necessity of trials if there is no genuine dispute as to any material facts and the moving party is entitled to judgment as a matter of law.[52]

## B. Texas law regarding the interpretation of an insurance policy

In Texas, the interpretation of an insurance policy is governed by the general rules of contract construction.[53] The Court is concerned primarily with giving attention and effect to the intentions of the contracting parties as expressed in the contract.[54] The focus of the Court's inquiry in determining the meaning of a contract is the objective intention of the parties as evidenced in the contract itself.[55] The question of whether a contract is ambiguous is a question of law that is made by the Court.[56] If the Court determines the contract is unambiguous, the Court, not a jury, is to interpret the legal meaning of the contract's provisions.[57] If the

**45.** *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Wise v. E.I. DuPont De Nemours & Co.*, 58 F.3d 193, 195 (5th Cir.1995).

**46.** See *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 449 (5th Cir.1996).

**47.** *LaPierre v. Benson Nissan, Inc.*, 86 F.3d at 449 (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 375 (5th Cir.1969) (*en banc* )).

**48.** *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

**49.** *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505.

**50.** *Hibernia Nat'l Bank v. Carner*, 997 F.2d 94, 97 (5th Cir.1993).

**51.** See *Dailey v. Johnson & Johnson Consumer Products Inc.*, 850 F.Supp. 549, 552 (N.D.Tex. 1994) (quoting *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.1992), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992)).

**52.** *Fields v. City of South Houston, Texas*, 922 F.2d 1183, 1187 (5th Cir.1991).

**53.** *Grain Dealers Mutual Insurance Company v. McKee*, 943 S.W.2d 455, 458 (Tex.1997); *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex.1995); *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex.1994).

**54.** *R & P Enter. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex.1980); *Sidelnik v. American States Ins. Co.*, 914 S.W.2d 689, 691 (Tex.App.-Austin 1996, writ denied).

**55.** *Fuller v. Phillips Petroleum Co.*, 872 F.2d 655, 657 (5th Cir.1989).

**56.** *R & P Enterprises*, 596 S.W.2d at 518.

**57.** *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968); *Wahlenmaier v. American Quasar Petroleum Co.*, 517 S.W.2d 390, 393 (Tex.Civ.App.—El Paso 1974, writ ref. n.r.e.).

Court deems a contract to be unambiguous, there plainly is no fact issue regarding the contracting parties' intent that need be considered by the jury.[58] But, if the contract is susceptible to two or more reasonable interpretations, the contract is ambiguous.[59] If the Court determines the contract is ambiguous and conflicting parol evidence is considered to resolve the ambiguity, the question of the true intent of the parties becomes a fact issue for the jury.[60]

Under basic contract construction, the preferred interpretation is one that provides meaning to every provision and does not read any term out of the contract.[61] An endorsement cannot be read apart from the main policy, and the added provisions will supersede the previous policy terms to the extent they are truly in conflict.[62] Although it is preferable to construe a policy to not create surplusage or leave portions of the policy useless or inexplicable, surplusage alone does not create an ambiguity.[63] Parol evidence of the parties' intent is not admissible to create an ambiguity, but the contract may be read in the light of the surrounding circumstances to determine whether an ambiguity exists.[64]

When a contract can be given a definite or certain legal meaning, it is unambiguous.[65] But if, after applying the rules of construction, the contract is subject to more than one reasonable interpretation, it is ambiguous and the interpretation that most favors coverage will be adopted.[66] "Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." [67]

**58.** *Triland Inv. Group v. Warren,* 742 S.W.2d 18, 22 (Tex.App.-Dallas 1987), *rev'd on other grounds,* 779 S.W.2d 808 (Tex.1989).

**59.** *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex. 1996) (citation omitted).

**60.** *Trinity Universal Ins. Co. v. Ponsford Brothers,* 423 S.W.2d 571, 575 (Tex.1968); *Amistad, Inc. v. Frates Communities, Inc.,* 611 S.W.2d 121, 127 (Tex.Civ.App.-Waco 1980, writ ref. n.r.e.).

**61.** *Woods v. Sims,* 154 Tex. 59, 273 S.W.2d 617, 620–21 (1954)(Even where different parts of the instrument appear to be contradictory and inconsistent with each other, the court will, of possible, harmonize the parts and construe the instrument in such way that all parts may stand and will not strike down any portion unless there is an irreconcilable conflict wherein one part of the instrument destroys in effect another part); *Mesa Operating Co. v. California Union Ins. Co.,* 986 S.W.2d 749, 753 (Tex.App.-Dallas 1999, pet. denied); *Eagle Life Ins. Co. v. G.I.C. Ins. Co.,* 697 S.W.2d 648, 651 (Tex. App–San Antonio 1985, writ ref'd n.r.e.).

**62.** *Mesa Operating Co.,* 986 S.W.2d at 754; see *Westchester Fire Ins. v. Heddington Ins. Ltd.,* 883 F.Supp. 158, 165 (S.D.Tex.1995), *aff'd,* 84 F.3d 432 (5th Cir.1996).

**63.** *Grain Dealers Mutual Insurance Company v. McKee,* 943 S.W.2d at 458.

**64.** *Balandran v. Safeco Ins. Co. of Am.,* 972 S.W.2d 738, 741 (Tex.1998); *National Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995).

**65.** *Grain Dealers Mutual Insurance Company v. McKee,* 943 S.W.2d at 458; *CBI Indus.,* 907 S.W.2d at 520.

**66.** *Grain Dealers Mutual Insurance Company v. McKee,* 943 S.W.2d at 458 (citing *Kelly Assocs., Ltd. v. Aetna Cas. & Sur. Co.,* 681 S.W.2d 593, 596 (Tex.1984)).

**67.** *Grain Dealers Mutual Insurance Company v. McKee,* 943 S.W.2d at 458; *CBI Indus.,* 907 S.W.2d at 520.

## VI. ARGUMENTS AND CONCLUSIONS OF LAW

### A. Whether General Star's objections to Per Schneider's affidavit should be sustained, whether General Star's motions to strike the affidavits of Per Schneider, Bob Lampkin and Anastacio Martinez should be granted and whether General Star's objection to the Reliable Reports, Inc. report should be sustained

In its reply briefs in support of its motions for summary judgment on allocation and commencement, General Star has objected to the affidavit of Per Schneider [68] and has moved to strike the affidavits of Per Schneider, Bob Lampkin and Anastacio Martinez,[69] arguing that the affidavits "are in direct contradiction to prior deposition testimony." [70] In further reference to Mr. Schneider's affidavit, General Star contends that his expert opinions lack an appropriate foundation, arguing that "[f]or the testimony of an expert to be offered in the summary judgment context ... [the expert is required] ... to express the factual support for his opinions, and 'include materials on which the expert based his opinions as well as an indication of the reasoning process underlying the opinion.' " [71]

Brookes filed an objection and motion to strike each of General Star's replies briefs for the reason that the Local Rules do not authorize the filing of replies [72] and, alternatively, request permission to file a "supplemental response" to General Star's replies.[73] Reply briefs are permissive documents; it has been the practice of the Court to consider reply briefs, if timely filed, but not to await the filing of a reply before ruling.[74] Brookes' motion to strike [75] should be *denied*. Brookes' alternative motion to file a supplemental response [76] should be *granted in part* and the Court has considered the arguments in the supplemental response [77] that respond to the objections and motions to strike raised in General Star's replies; in any other respect the motion should be *denied* and the additional arguments in the supplemental response that are in the nature of a sur-reply have not been considered in preparing this report. General Star's alternative motion to file a reply to defendants' response,[78] to the extent the alternative motion is an after-the-fact request for leave to file the reply briefs that Brookes seek to strike, should be *granted;* in any other respect, the alternative motion to file a reply should be *denied*. General Star's motion to file a reply to Brookes' supplemental response,[79] which tenders the proposed pleading, should be *granted in part and denied in part*. To the extent that the tendered "reply" does reply to arguments presented in Brookes' supplemental response on General Star's objections to evidence and the motions to strike, the motion should be granted and

---

68. Docket nos. 137 at 2 and 138 at 2.

69. *Id.*

70. Docket no. 138 at 2; docket no. 137 at 2. General Star advances no other ground in support of its motion to strike the affidavits of Lampkin and Martinez. Docket no. 138 at 2–4.

71. Docket no. 138 at 2 (quoting *Boyd v. State Farm Ins. Cos.,* 158 F.3d 326 (5th Cir.1998)).

72. Docket no. 140.

73. Docket no. 140 at 2.

74. Local Rule CV–7(e), amended effective December 1, 2000, codifies this general practice.

75. Docket no. 140.

76. Docket no. 140 at 2.

77. Docket no. 142.

78. Docket no. 141 at 3.

79. Docket no. 143.

the tendered pleading has been considered; in all other respects, the motion should be denied since there is no showing that the arguments presented in the tendered pleading were not or could not have been presented in an earlier pleading.[80]

### 1. *Affidavits contradict depositions*

General Star has moved to strike the affidavits of Schneider, Lampkin and Martinez on the issue of commencement on the ground that the "affidavits are in direct contradiction to prior deposition testimony."[81] With respect to Mr. Schneider's affidavit, General Star contends that:

> Per Schneider stated throughout the course of his deposition that he could not render any opinions that the damage commenced prior to August 1999 when the plumbing tests were conducted.... Further, Mr. Schneider state that based upon his inspection and empirical investigation he could only state the damages commenced within 2 months of the plumbing tests being October—November 1999.[82]

But, in his affidavit, Mr. Schneider provides expert opinions that, in sum, the damages to the three properties in question were caused by plumbing leaks that commenced within the policy period. General Star objects to Mr. Schneider's affidavit based on this inconsistency and has moved to strike the affidavits of Schneider, Lampkin and Martinez on this ground.

Mr. Schneider's affidavit acknowledges that "[i]n my deposition, I stated that I had no opinion regarding whether there were plumbing line leaks that caused structural or other damage to the Sage West, Casa Linda, and Eldon Square Apartments in 1997 or 1998."[83] But, "[b]ased on my review of this information [after the time of his deposition] that damage consistent with plumbing line leaks were observed in late 1997 and early 1998, it is my opinion that, in engineering probability, leaks in the underground plumbing systems of the buildings at the Sage West, Casa Linda and Eldon Square Apartments existed in 1997 and 1998."[84] Mr. Schneider's affidavit recites that:

> [i]n all probability according to accepted engineering standards, had plumbing or hydrostatic tests been performed on the Sage West, Casa Linda and Eldon Square Apartments in 1997 and 1998, they would have confirmed plumbing line leaks under the foundations of at least some of the buildings in each of these apartment complexes just as the tests performed in 1999 confirmed plumbing line leaks.[85]

Mr. Schneider further states that after his deposition he reviewed the data of James Goldston, P.E., Dr. Ramon Carrasquillo, P.E., and Mr. Andre Garner, P.E., experts retained by General Star, and based on that data and his experience with the effects of plumbing leaks on foundation movement, "it is now my opinion that one hundred percent (100%) of the foundation repairs I have recommended are attributable to the plumbing leaks and approxi-

---

**80.** The record reflects that General Star was allowed to file another reply (docket no. 148) to defendants' supplemental response in which General Star addresses the proffered correction to the Lampkin affidavit, supplies an exhibit and tenders the Reliable Reports, Inc. report.

**81.** Docket no. 138 at 2.

**82.** Docket no. 138 at 2.

**83.** Appendix to defendants' responses, vol. II, C at 1, ¶ 3.

**84.** Appendix to defendants' responses, vol. II, C at 2, ¶ 6.

**85.** Appendix to defendants' responses, vol. II, C at 2, ¶ 7. Mr. Schneider's affidavit does not provide any further information on which specific buildings would have been confirmed to have plumbing line leaks.

mately seventy percent (70%) of the cosmetic damage are attributable to the plumbing leaks."[86]

Therefore, General Star's objection to and motion to strike Mr. Schneider's affidavit on the commencement issue based on inconsistencies between the affidavit and prior deposition testimony should be *overruled* and *denied*, respectively. General Star's objection and motion go to the weight but not the admissibility of Mr. Schneider's affidavit.

General Star's motion to strike the affidavits of Lampkin and Martinez on the commencement issue provides no specific argument as to how and why those two affidavits contradict with any deposition testimony provided by those two affiants or with Mr. Schneider's affidavit[87] such that the two affidavits are inadmissible. Therefore, General Star's motion to strike the affidavits of Lampkin and Martinez on the issue of commencement[88] should be *denied*.

### 2. FED. R. EVID. 702 challenges to Mr. Schneider's affidavit

General. Star also objects to and has moved to strike Mr. Schneider's affidavit on the issues of commencement and allocation on the ground that it does not provide factual support for certain of his expert opinions, the materials on which each opinion is based and the reasoning process and, alternatively, that the underlying evidence in support of Schneider's conclusions is insufficient to support his opinions.[89] With respect to commencement, General Star challenges Mr. Schneider's opinion that the damages to the three complexes in question were caused by underground plumbing leaks that commenced within the policy period. With respect to allocation, General Star challenges Schneider's opinions that 100 percent of the foundation repairs he recommends and 70 percent of the costs of cosmetic repairs to the buildings were attributable to underground plumbing leaks.

### a. Daubert and FED. R. EVID. 702 and 703

The Federal Rules of Evidence permit the use of expert testimony when such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue.[90] A witness may be an expert by virtue of his or her knowledge, skill, experience, training or education. In giving testimony, an expert may rely on three types of facts or data: those perceived directly by the expert before trial, those made known to the expert during the trial and those made known to the expert before trial and based on something other than the expert's own perceptions.[91] If the evidence relied upon by the expert is inadmissible, then it must be data that is "reasonably relied upon by experts in the particular field."[92] In addition, a trier of fact must determine whether there are good grounds to rely on this data to draw the conclusion reached by the expert.[93]

---

**86.** Appendix to defendants' responses, vol. II, C at 2, ¶ 9.

**87.** Mr. Schneider's affidavit refers to Mr. Lampkin by name (in references to Mr. Lampkin's deposition testimony and Mr. Lampkin's observations of damages), but not Mr. Martinez by name. Appendix to defendants' responses, vol. II, C.

**88.** Docket no. 138 at 2.

**89.** Docket nos. 137 at 2 and 138 at 3.

**90.** FED. R. EVID. 702.

**91.** *See* FED. R. EVID. 703.

**92.** Rule 104, FED R. EVID., allows the Court to consider inadmissible evidence when making its *Daubert* ruling.

**93.** *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 749 (3d Cir.1994).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the United States Supreme Court set forth a two-pronged test for the admission of scientific expert testimony: is the expert opinion based on the scientific method and is there a "fit" between the expert testimony and the disputed issues in the case.[94] The Supreme Court held that expert scientific testimony must be "ground[ed] in the methods and procedures of science" and based on "more than a subjective belief or unsupported speculation."[95] The Supreme Court explained that proposed testimony must be supported by appropriate validation, that is, "good grounds," based upon what is known.[96] To be admissible under the *Daubert* standard, an expert's opinion must have a "reliable basis in the knowledge and experience of his discipline."[97] *Daubert* set forth a nonexclusive list of factors for the Court to consider in analyzing scientific expert evidence.

Accordingly, the Fifth Circuit directed that a court determine that the reasoning and methodology underlying a proffered expert opinion are scientifically valid and that the reasoning and methodology can be applied properly to the facts in issue.[98] In *Allen*, the Fifth Circuit held that for every conclusion contained in the expert's proposed testimony, the Court must determine if the methodology leading to that conclusion is sound.[99] In the case of nonscientific expert testimony, the Fifth Circuit has noted that *Daubert* applies even though each of the factors outlined in *Daubert* for determining the reliability of expert testimony may not be applicable to every such case. Nevertheless, the court must exercise its gatekeeping function to ensure that expert testimony based on experience and training is reliable.[100]

The amendments to FED. R. EVID. 702, effective December 1, 2000, codify *Daubert* and *Kumho Tire Co.* by expressly providing that if scientific, technical or specialized knowledge will assist the trier of fact, a qualified witness may testify in the form of an opinion if:

(1) the testimony is based upon sufficient facts or data,

(2) the testimony is the product of reliable principles and methods, and;

(3) the witness has applied the principles and methods reliably to the facts of the case.[101]

94. 509 U.S. 579, 595, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469 (1993). *See also General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997) ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

95. *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786.

96. *See Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 196 (5th Cir.1996).

97. *Allen*, 102 F.3d at 196; *see Daubert*, 509 U.S. at 590, 113 S.Ct. 2786.

98. *Daubert*, 509 U.S. at 590–92, 113 S.Ct. 2786.

99. 102 F.3d at 196.

100. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court resolved a split among the circuits to make it clear that the *Daubert* "gatekeeping" function applied to all expert opinion testimony based on specialized knowledge, not merely scientific expert testimony. The Fifth Circuit had previously held that *Daubert* applies to expert testimony based on engineering principles and practical experience. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir.1997).

101. FED.R.EVID 702.

The advisory committee notes state that prong (1) is "quantitative" rather than "qualitative"—the expert must be relying on sufficient facts or data—and prongs (2) and (3) are "qualitative." In reviewing a *Daubert* challenge, the Court does not decide credibility, only whether the threshold reliability standards have been satisfied.

*Daubert* standards apply not merely at trial, but also on summary judgment. "For the purposes of summary judgment . . . an expert affidavit must include materials on which the expert based his opinion, as well as an indication of the reasoning process underlying the opinion."[102]

### b. *Application of* Daubert *Factors and* Fed. R. Evid. *702 to Mr. Schneider's Affidavit*

In this case, Brookes seek to prove that certain damages to the three apartment complexes were caused by "the accidental discharge of water from within a plumbing system."[103] More specifically and in sum, Brookes' theory on damages is that leaks commenced in underground plumbing lines during the policy period, that the leaks caused movement in foundations, that the movement in foundations caused damages to certain buildings within the three apartment complexes, and that the damages may be allocated between those covered losses and other non-covered losses that may have been incurred by the premises in question because, "there is no non-covered damage to segregate."[104] Through Mr. Schneider's challenged testimony on the issues of commencement and allocation,

Brookes wish to establish that plumbing leaks commenced during the policy period and that a reasoned allocation may be made between covered and non-covered damages.

For example, Mr. Schneider states that "it is my opinion that, in engineering probability, leaks in the underground plumbing systems . . . existed in 1997 and 1998."[105] The term "engineering probability" is not defined in the affidavit. Schneider also states that "it is now my opinion that one hundred percent (100 %) of the foundation repairs I have recommended are attributable to the plumbing leaks and approximately seventy percent (70 %) of the cosmetic damage are attributable to plumbing leaks" (presumably the "damages consistent with plumbing line leaks . . . observed in late 1997 and early 1998").[106] Schneider does not explain how he reached these and the other challenged conclusions based on the materials that he reviewed, but only that he did review noted information and that he did reach the conclusions.

Mr. Schneider's summary judgment affidavit does not establish that there were, in fact, plumbing line leaks in the three apartment complexes in 1997 and 1998 only that the evidence observed by others, in his opinion, is consistent with a plumbing line leak "under the foundations of at least some of the buildings in each of these apartment complexes" such that "[i]n all probability" such leaks existed.[107] Mr. Schneider's affidavit does not identify which foundations of which buildings in these multi-building apartment complexes

---

102. *See Michaels v. Avitech, Inc.*, 202 F.3d 746, 754 (5th Cir.2000), *cert. denied*, 531 U.S. 926, 121 S.Ct. 303, 148 L.Ed.2d 243 (2000) (citing *Boyd v. State Farm Ins. Companies*, 158 F.3d 326, 331 (5th Cir.1998)); *see also Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798.

103. Docket no. 92, exhibits D, E and F (Brookes' three proofs of loss).

104. Docket no. 133 at 8; docket no. 129 at 6.

105. Appendix to defendants' responses, vol. II, C at 2, ¶ 6.

106. Appendix to defendants' responses, vol. II, C at 2, ¶ 9.

107. Appendix to defendants' responses, vol. II, C at 2, ¶ 7.

"in all probability" were damaged by plumbing line leaks; why he formed that opinion in reference to specific evidence; whether and to what extent the damages commenced during the policy period; or, how, for example, he was able to form an opinion that 70 percent of the "cosmetic damages" were caused by plumbing leaks and 30 percent were not. Although Brookes are correct that these objections go to the weight of the evidence,[108] as discussed above, they also go to admissibility.

Further Mr. Schneider's affidavit does not offer a factually supported explanation of to what extent and why he changed opinions in his deposition that improper drainage, normal climactic conditions, drought, rain, flood, vegetation and "anything that would be a source of moisture" combined to cause the "technical failure of the foundations."[109] Brookes' argument that because repairs to foundations caused by covered plumbing leaks necessarily will repair in the process damage caused by non-covered losses so that "there is no non-covered damage to segregate,"[110] masks their failure of proof as to causation of specific covered losses in specific covered buildings that commenced in the policy period.

Conclusory opinions by designated experts lack the requisite evidentiary reliability mandated by Rule 702 because they fail to set forth a discernable methodology. Neither *Daubert* nor the Federal Rules of Evidence "requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."[111] Here, Mr. Schneider's affidavit does not explain why and how he concluded that specific damages observed by others were consistent with plumbing line leaks. Assuming that personal observations of others and review of the information noted in Mr. Schneider's affidavit is a sufficient basis on which to form an opinion on causation, the failure of the affidavit to state a methodology or explanation as to how Mr. Schneider formed each opinion precludes the Court from entering the required *Daubert* findings regarding opinions on commencement and allocation. Schneider's affidavit, therefore, should not be considered competent summary judgment evidence in response to General Star's motions for summary judgment on commencement or allocation. This is not to say that Mr. Schneider could not testify at trial, in accordance with the scope of expert witness designations and reports, only that the affidavit may not be considered on summary judgment.

But, even if the Court were to agree that Mr. Schneider's affidavit sufficiently sets forth the bases of his opinions that the damages observed are consistent with plumbing line leaks and that "[i]n all prob-

---

108. Docket no. 142 at 3. Brookes' also argue that General Star's challenges to their evidence "would be better addressed in a *Daubert* motion" (docket no. 142 at 2). But, as noted, the Fifth Circuit applies *Daubert* in the summary judgment setting and the Local Rules do not require that *Daubert* challenges to summary judgment evidence be raised in separate motions.

109. Appendix to defendants' responses, vol. III, DD at 135–36.

110. Docket no. 133 at 8; docket no. 129 at 6.

111. *General Electric Co. v. Joiner*, 522 U.S. at 146, 118 S.Ct. at 519. In *Black v. Food Lion, Inc.*, 171 F.3d 308 (5th Cir.1999), the Fifth Circuit reversed a magistrate judges's decision to allow expert testimony stating: "The magistrate judge either substituted his own standards of reliability for those in *Daubert*, or he confused the *Daubert* analysis by adopting an excessive level of generality in his gatekeeping inquiry." 171 F.3d at 313. "The court's task was to determine whether Dr. Reyna's methodology tied the fall at Food Lion by some specific train of medical evidence to Black's development of fibromyalgia." 171 F.3d at 314.

ability according to accepted engineering standards" plumbing tests performed in 1997 and 1998 would have confirmed plumbing leaks, these opinions as to causation offer *no* evidence as to which plumbing leaks, if any, commenced during the policy period. Without evidence on commencement, Mr. Schneider's affidavit offers a legally insufficient basis for allocating non-covered and covered damages to these three apartment complexes occurring within the policy period.

### 3. *Other objections to evidence*

Finally, in the course of summary judgment briefing, Brookes filed a supplemental response to General Star's motions for summary judgment which, among other things, submitted a corrected affidavit of Mr. Lampkin, provided a summary of repair estimates that were omitted inadvertently from the appendix and submitted, as summary judgment evidence, a report from Reliable Reports, Inc. produced by General Star to Brookes in discovery. General Star filed a reply to the supplemental response which recited that it had no objection to the submission of Mr. Lampkin's affidavit, the filing of the revised damage estimate or the timeliness of the filing of the report from Reliable Reports, Inc., but did "object to the admissibility, relevance ... and the conclusion defendants suggest should be drawn from that document."[112] General Star argues: "In summary, this report provides no evidence at all on any matter at issue in the pending summary judgment."[113]

---

**112.** Docket no. 148 at 2.

**113.** *Id.*

**114.** Docket no. 146 at 4.

**115.** Docket no. 92 at 3. This provision is located in the portion of the policy identified as "commercial property conditions," section h, "policy period," "coverage territory."

Brookes have tendered the Reliable Report, Inc. report to show, in sum, that the premises in question were inspected on or about February 19, 1997 and that no preexisting damages were noted as of that date.[114] The Court cannot agree that an inspection of the premises undertaken near the time of the commencement of the policy is irrelevant to issues relevant to commencement. Therefore, the objections to the Reliable Report, Inc. report are *overruled.*

### B. Whether General Star is entitled to summary judgment as a result of the policy clause limiting coverage to loss or damage commencing during the policy period

General Star's motion for summary judgment (commencement) argues that judgment as a matter of law should be entered in its favor based on the policy provision that states: "[u]nder this coverage part .... [w]e cover loss or damage commencing .... [d]uring the policy period shown in the declarations."[115] The declarations provide that the policy was in effect beginning February 7, 1997, and ending February 8, 1998.[116] In sum, General Star argues that because "there is no evidence of a covered loss occurring within the policy period," it is entitled to summary judgment.[117]

In support of its motion for summary judgment on commencement, General Star argues that "Brookes have not set forth any evidence that a loss commenced dur-

---

**116.** Appendix to defendants' responses, vol. I, A (common policy declarations page). Unless otherwise noted, for ease of reference, references to the policy in this report and recommendation are to Brookes' appendix. General Star has provided substantially the same information in attachments to its motions for summary judgment as well. *See also* appendix to this report.

**117.** Docket no. 92 at 4, ¶ 5.

ing the policy period .... [t]he evidence conclusively shows that there [were] substantial foundation problems for many years before the policy was in effect." [118] General Star presents evidence of damages that predated the policy period through: the deposition testimony of Anastacio Martinez, an electrical, appliance and air conditioning repair maintenance worker employed at the Sage West Apartments for 20 years,[119] the deposition testimony of Larry Moya, a make-ready (painter) maintenance worker employed at the Sage West Apartments,[120] and the deposition testimony of Robert Maxhimer,[121] property manager of the Sage West, Casa Linda and Eldon Square Apartments beginning in 1997.[122]

Mr. Martinez testified to the existence of damage at the Sage West, Eldon Square and Casa Linda Apartments before 1997, including plumbing problems, cracks in walls, window frames separating from the brick, sloping floors and a sinking building.[123] Mr. Moya testified that since 1997 the exterior cracks in the walls of the Sage West Apartments have been "about the same" and, at the approximate time of his 2000 deposition, and he "sometimes" tapes and floats (fixes cracks) before painting apartments.[124] Mr. Maxhimer testified that cracks in walls existed at the Sage West, Casa Linda and Eldon Square Apartments at the time he became the

property manager in 1997,[125] and he responded affirmatively to the inquiry of whether the Eldon Square Apartments were "experiencing cracking and some other signs of movement," in 1997.[126] Because "it is undisputed that no test or other data were submitted to General Star which evidence a loss that commenced in the policy period," [127] General Star argues that it is entitled to summary judgment on commencement.

Brookes oppose summary judgment on commencement, initially arguing that *Robbins v. Maryland*, stands for the proposition that, regardless of when a loss commenced, under Texas law "an insured may recover under a policy of insurance for a loss occurring prior to issuance of the policy; provided that neither the insured nor the insurer knew of the loss when the contract was made." [128] But, *Robbins* stands for a more limited proposition— that is, "a contract of property insurance may, *if the parties so intend,* effectively protect against a loss occurring prior to issuance of the policy provided neither the applicant nor the insurer knew of the loss when the contract was made." [129] In this case, the intent of the parties unambiguously expressed in the words of the policy was to exclude losses which did not occur "[d]uring the policy period shown in the declarations." [130]

---

118. Docket no. 92 at 4, ¶ 5.

119. Docket no. 92 at 4–13; *see also* Appendix to defendants' responses, vol. II, E. Martinez testified that in his 20 years of employment at Sage West he has also worked at the Casa Linda and Eldon Square apartments.

120. Docket no. 92 at 13–14.

121. Docket no. 92 at 15–16.

122. Docket no. 92 at 15.

123. Docket no. 92 at 5, 6, 8–13.

124. Docket no. 92 at 14.

125. Docket no. 92 at 15.

126. Docket no. 92 at 15.

127. Docket no. 92 at 16.

128. 472 S.W.2d 203, 208 (Tex.Civ.App.—Corpus Christi 1971), writ ref'd n.r.e.

129. *Burch v. Commonwealth County Mut. Ins. Co.,* 450 S.W.2d 838, 839 (Tex.1970) (emphasis added).

130. Docket no. 92 at 3.

Next, Brookes argue that "there is ample summary judgment evidence that losses occurred during the policy period,[131] there is a factual dispute as to whether the losses commenced during the policy period," and "because neither Brookes nor General Star were aware of damages caused by plumbing leaks when the policy was issued, Brookes are entitled to recover for losses due to plumbing leaks which might have begun, but were not manifested before the policy period." Brookes also rely on the deposition testimony of Martinez, Moya and Maxhimer, pointing out that none of them are experts in foundations or plumbing.[132]

The observations of Martinez, Moya and Maxhimer as to damages to parts of the three apartment complexes in question does not speak to when the damages began. If a loss did not "commence" during the General Star's policy period, General Star is not liable under its policy of insurance. Brookes has evidence of damages to portions of the three apartment complexes in question, but, as discussed in this report, has offered no evidence demonstrating when losses commenced.

Attempting to demonstrate that leaks commenced during the policy period, Brookes point to plumbing repairs that were conducted on January 22, 1998 at two buildings within the Casa Linda Apartments which General Star's agent, an adjuster, witnessed.[133] Brookes argues that this confirmed existence of leaks at the Casa Linda Apartments during the policy period is evidence that leaks commenced during the policy period, or at least raises a question of fact as to commencement.[134]

According to the report dated January 23, 1998 prepared by an adjuster for General Star, a kitchen sink was not draining properly in unit 33-# 3 in the Casa Linda complex.[135] A "professional plumber ... snaked the line and brought up mud."[136] The plumber then "tunneled under the building to locate the source of the stoppage, finding the case iron sewer system to be in a badly deteriorated state."[137] According to the report, the property manager indicated that other plumbing problems had occurred with this sink previously, and in those instances, attempts to clear the blockage had similarly brought up mud.[138] However, in those instances, snaking the line was sufficient to clear the blockage.[139]

Repairs concurrently were being completed in unit 33-# 1, Apartment # 7 of the Casa Linda Apartments.[140] The report refers to a piece of PVC pipe that had been removed which had previously functioned as the clean-out.[141] According to the report, "[t]he presence of the PVC clean-out would indicate a section of the sewer line may have broken in the past,

---

**131.** Docket no. 133 at 8, ¶ 19.

**132.** Docket no. 133 at 11. Brookes also rely on Mr. Schneider's affidavit, discussed above.

**133.** Docket no. 133 at 5; appendix to defendants' responses, vol. I, B, 2 at 2.

**134.** Docket no. 133 at 5, n. 4 (citing Appendix to defendants' responses, vol. I, B, 2 at 2), 11.

**135.** Appendix to defendants' responses, vol. I, B, 2 at 2.

**136.** Appendix to defendants' responses, vol. I, B, 2 at 2.

**137.** Appendix to defendants' responses, vol. I, B, 2 at 2.

**138.** Appendix to defendants' responses, vol. I, B, 2 at 2.

**139.** Appendix to defendants' responses, vol. I, B, 2 at 2.

**140.** Appendix to defendants' responses, vol. I, B, 2 at 3.

**141.** Appendix to defendants' responses, vol. I, B, 2 at 3.

and PVC would have been used within the last 10 or so years to repair the break." [142]

The evidence of leaks at units 33–# 1 and # 2 at the Casa Linda Apartments is particularly relevant, because these leaks are the only documented leaks that existed during the policy period noted by Brookes in response to General Star's motion for summary judgment. For the Court to deny General Star's motion, it would have to conclude that the existence of these leaks during the policy period raises an issue of material fact as to whether they commenced prior to, or during the policy period. Further, the Court would have to conclude that the fact that these two leaks existed raises a fact issue as to whether other leaks existed, not only at Casa Linda, but, as argued by Brookes, also at Sage West and Eldon Square—which together comprise a total of 80 buildings. [143]

The summary evidence regarding the leaks at units 33–# 1 and # 2 at the Casa Linda Apartments, limited to only those leaks, is insufficient to raise a fact issue at to whether the leaks commenced during the policy period. The evidence demonstrates that at the time of the repair in 1998 one leak had been repaired previously "within the last 10 or so years" and the other was caused by a "cast iron sewer system to be in a badly deteriorated state." This evidence would not support a finding that the leaks commenced during the policy period, but it is the only evidence relied upon by Brooks. [144] Further,

the existence of two leaks at Casa Linda during the policy period certainly does not raise a fact issue as to whether other leaks at Casa Linda, Eldon Square or Sage West commenced during the policy period.

Other evidence of leaks come from tests conducted in 1999. But, these tests do not show that leaks commenced in the policy period. [145] The recent decision of the District Court granting summary judgment in favor of the insurance company in *General Star Indemnity Company v. Agape Metro Housing, Inc., et al.,* is instructive. [146] In *General Star Indemnity,* the District Court construed identical policy language on "commencement" and the Texas case law which affirms that "proof that the loss occurred within the policy period is a precondition to coverage and, thus, the insured's responsibility." [147] Although damage to the covered property had been established, the insured's tests demonstrated water leaks only after the policy period.

In this case, as in *General Star Indemnity,* there are no plumbing tests that show that any plumbing or sewer line leaks commenced during the pendency of the policy. There are observations of damages to certain of the buildings made by Martinez, Moya and Maxhimer before, during and after the policy period which, through the discredited Schneider affidavit, Brookes wishes to show were caused by plumbing line or sewer leaks commencing in the policy period. [148] But, as dis-

---

**142.** Appendix to defendants' responses, vol. I, B, 2 at 3.

**143.** Docket no. 146 at 4 n. 5.

**144.** *See* docket no. 133 at 11.

**145.** Appendix to defendants' responses, vol. III, M, N and O.

**146.** No. SA–99–CA–1104–HG (W.D.Tex., Dec. 8, 2000).

**147.** *New Hampshire Ins. Co. v. Martech USA, Inc.,* 993 F.2d 1195, 1199 (5th Cir.1993); *see also Agape,* No. SA–99–CA–1104 at 2 (citing *Data Specialties, Inc. v. Transcontinental Ins. Co.,* 125 F.3d 909, 911 (5th Cir.1997) ("Texas law clearly states that for an insurance company to be liable for a breach of its duty to satisfy a claim presented by its insured, the insured must prove that its claim falls within the insuring agreement of the policy.")).

**148.** Other evidence arguably related to commencement and causation offered in connec-

cussed above, even if Mr. Schneider's affidavit is considered to be sufficient, there is no evidence that shows that a plumbing line or sewer leak actually commenced in any of the buildings in any of the three apartment complexes during the policy period with the exception of the confirmed leaks in two apartments at Casa Linda in 1998 which were repaired. It is impermissibly speculative to draw the inference from this evidence that all the damage to many buildings at three apartment complexes were caused by plumbing leaks that commenced during the policy period.

Brookes also relies on a report from "Reliable Reports, Inc." dated twelve days after the policy in suit was issued and prepared in connection with the issuance of the General Star insurance policy.[149] The report lists the address of the Casa Linda Apartments, but states that there are a total of 342 units and 80 buildings which indicates that the report concerns additional, unspecified buildings and complexes.[150] The report does not expressly state its purpose, but it appears to concern itself chiefly with fire safety issues, addressing electrical wiring, cooking and heating equipment, the presence of fire extinguishers, out-door barbecue grills, the terms and conditions of tenant barbecuing, the location of the closest fire department and other matters relating to fire hazards.[151] There is no discussion of foundations, foundation movement, drainage, plumbing or plumbing leaks. The report's cover page has sections entitled, "recom-mendations for risk improvement," "management accountability," "loss analysis," and "opinion of risk."[152] With respect to management accountability, the report indicates that the manager and maintenance foreman had "a positive attitude toward safety."[153] Although Brookes concede that the report concludes that building condition is "poor,"[154] the report indicates that the "[r]isk is considered good" and that the [r]isk meets necessary guidelines for its class of business."[155]

Brookes argue that "Reliable's report evidences that there were no pre-existing damages on February 19, 1997," because the report is silent as to damage to walls, plumbing or foundations.[156] Therefore, Brookes argue that the report supports the inference that the damages to the complexes in question occurred between February 7, 1997 and February 8, 1998. But, there is no evidence that the inspector who prepared the Reliable report inspected the plumbing or foundations or conducted any plumbing or sewer line tests were performed or that any plumbing or sewer line leaks were detected or observed. That there are no places in the report form where the inspector was to record observations about plumbing, plumbing leaks, evidence of water damage, or the condition of the foundation supports the conclusion that the purpose of the report was to address safety concerns and not latent plumbing or foundation defects. Even if the report is considered to support an inference that certain damages must have occurred dur-

tion with the 14–day motion is discussed when the 14–day motion is discussed below.

**149.** Docket no. 146 at 4; docket no. 148 at 2.

**150.** Docket no. 146 at 4 n. 5. Brookes' briefing argues (*id.*) that "it is apparent" that the Report covers the three apartment complexes involved in this report, but there is no summary judgment evidence that would allow the court to consider that fact as established or uncontested. *See* docket no. 148 at 2.

**151.** Docket no. 146, exhibit A.

**152.** Docket no. 146, exhibit A at 02396.

**153.** Docket no. 146, exhibit A at 02396.

**154.** Docket no. 146 at 3 and exhibit A at 02400.

**155.** Docket no. 146, exhibit A.

**156.** Docket no. 146 at 4.

ing the policy period, because they were not documented as being in existence in the Reliable report, the Reliable report offers no evidence that a plumbing line leak commenced during the policy period. And, as noted above, even if the problematic Schneider affidavit is considered to establish, in sum, that damages observed by others are consistent with damages caused by plumbing leaks, the Schneider affidavit does not establish that the plumbing leaks commenced in the policy period.

For the reasons stated above, it is recommended that General Star's motion for summary judgment (commencement) should be *granted*.

### C. Whether Brookes' summary judgment evidence is insufficient to allocate between covered and non-covered damage, entitling plaintiff to summary judgment

General Star's motion for summary judgment (allocation) argues that under Texas law, which recognizes the doctrine of concurrent causes, "the insured is entitled to recover only that portion of the damage caused solely by covered perils ... [t]o this end, the insured must present evidence upon which a jury can allocate the damage attributable to the covered peril." [157] Because Brookes' policy expressly excludes loss from "[a]ny earth movement (other than sinkhole collapse)," "[w]ear and tear" or "[s]ettling, cracking, shrinking or expansion," [158] General Star argues that Brookes must present evidence that allocates damages arising from

covered plumbing leaks and damages arising from other, non-insured causes. General Star argues that Brookes have failed to allocate damages as required.

In making its argument, General Star relies on evidence from Garland Burch and Per Schneider, defendants' witnesses, that plumbing line leaks and other perils likely contributed to Brookes' losses. Mr. Burch testified "whatever damage has occurred or whatever movement has occurred to those buildings is combination of [plumbing line leaks, landscape irrigation issues, and seasonal climactic issues, drought, and heavy rainfall]." [159] Mr. Burch later opined, "I believe [drought] definitely contributed to the movement of the slabs." [160] In response to the question of whether damages could be allocated in percentages, Mr. Burch stated that he could only "guesstimate" or make an "educated guess," but he concluded that "I just don't think that's the right way to go about trying to do that." [161] As noted above, Mr. Schneider also testified in his deposition that several factors including "differential movement" cause by seasonal changes, settlement, improper drainage, water moisture from sources other than plumbing line leaks and plumbing line leaks combined to cause the damage to the apartments. [162] General Star argues that Brookes' own evidence shows that "there is no evidence as to the amount of damages that are attributable to a plumbing line leak, a covered peril, versus natural settlement, an excluded peril," [163] and, therefore, summary judgment should be entered in favor of General Star.

---

157. Docket no. 91 at 4 (citing *Employers Casualty Company v. Block,* 744 S.W.2d 940, 945 (Tex.1988)).

158. The applicable provisions are found in the section of the policy captioned: "causes of loss—special form, section B, exclusions." *See* Appendix to defendants' responses, vol. I, A; *see also* the appendix to this report.

159. Docket no. 91 at 5.

160. Docket no. 91 at 5.

161. Docket no. 91 at 7.

162. Docket no. 91 at 12.

163. Docket no. 91 at 13. General Star's alternative motion for summary judgment argues that "[a] majority portion of the damages sought in this case are for damage to the underground, allegedly leaking, sewer system

Brookes oppose summary judgment on this ground arguing, in sum, that a jury need not allocate the damage attributable to the covered and excluded perils because they seek damages solely under the "covered perils" of: (1) the accidental discharge of water (the leaking water systems);[164] and, (2) the "access and repair costs" to repair damage caused by the accidental discharge of water.[165] Brookes argue that "the repair estimate ... reflects repairs associated strictly with accessing and replacing the parts of the buildings or structure to repair plumbing systems that leaked .... [which are] tied to the access and tear-out costs."[166] Therefore, "because Brookes are relying on a theory of sole causation of the damages for which they seek recovery, they have met their burden of proving that the damages for which they seek recovery are those attributable to the covered peril, the accidental discharge of water."[167]

Brookes' argument wholly fails to account for the evidence from their own witnesses that losses occurred at all three apartment complexes which were caused by seasonal changes, settlement, improper drainage and water moisture from sources other than plumbing line leaks as well as, allegedly, plumbing line leaks.[168] For example, as evidenced by the following deposition passages, Mr. Karam, Brookes' foundation expert, testified that, in sum, damages occurred from losses other than plumbing leaks and that he had not focused on allocating those non-covered damages:

A. Some of the movement may have been or some of the damage was attributable to age. Some of it may have been attributable to a drainage problem, and some of it was attributable to—in my opinion, there wasn't a doubt in my mind taking the condition that I saw, that they had sewer leaks.

Q. And tell me: Are you aware of any work that's been done to separate the damages that result simply from age from the damages that result from drainage as compared to the damages that result from the sewer leaks?[169]

\* \* \* \* \* \*

---

at the three apartment complexes .... [t]his property is excluded from coverage." Docket no. 97 at 4.

**164.** Docket no. 129 at 6, ¶ 17.

**165.** Docket no. 129 at 6, ¶ 18. Brookes argue that "access and repair costs" are covered under the portion of the policy captioned "causes of loss—special form," which states in part:

E. ADDITIONAL COVERAGE EXTENSIONS

\* \* \* \* \* \*

2. Water Damage, Other Liquids, Powder Or Molten Material Damage. If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

Appendix to defendants' responses, vol. I, A; *see also* the appendix to this report.

**166.** Docket no. 129 at 6, ¶ 17.

**167.** Docket no. 129 at 9, ¶ 23. As discussed further below, a case from this District construing identical relevant policy language, *General Accident Insurance v. Unity/Waterford—Fair Oaks, Ltd.*, holds that a reading of the policy to include coverage for the "accidental discharge of water" is "unreasonable." SA–97–CA–624–WWJ, docket no. 112 at 5 (W.D.Tex., Dec. 14, 2000) (granting summary judgment for insurer). Therefore, Brookes' reliance on the theory that "accidental discharge of water" is a covered peril is without merit.

**168.** *See* docket no. 91 at 5.

**169.** Appendix to defendants' responses, vol. III, CC. at 69.

A. What we do is we—we focus the damage attributable to the leak only and design a plan of repair and submit our estimates only on that covered peril. We don't pay attention to anything else because it's not covered.

Our job is to say, This is what it takes to fix the area that's damaged by this covered peril. So do we eliminate? We never include it to begin with.[170]

\* \* \* \* \* \*

Q. How do you determine, if you're going to level the entire foundation, which portion of the leveling is attributed to sewer leaks as compared to something else?

A. .... our estimates are focused only on the damage from the leaks. If it repairs other issues, we don't—we don't see that and don't care, because it's not relevant.[171]

\* \* \* \* \* \*

A. It would be like the windshield on an automobile. If there's a crack in the top left corner, they're not going to cut that portion of the windshield out and put and put a new piece in. You have to replace the windshield.

Oftentimes—even though there may have been pitted stuff and other things involved, you still have to do the whole windshield from that one incident. That's the same situation when you have a monolithic turned down beam on grade slab.[172]

Necessarily, under Texas law, Brookes cannot rely on a "sole causation" theory when there is evidence that multiple causes combined to create the loss. Brookes' waiver of any claim under "excluded perils" as opposed to "covered perils" is a legally insufficient attempt to circumvent the doctrine of concurrent causes' requirement of allocation.[173] Although Mr. Karam's did testify about the estimates: "we focus the damage attributable to the leak only and design a plan of repair and submit our estimates only on that covered peril. We don't pay attention to anything else because it's not covered,"[174] Mr. Karam also stated: "[i]f it repairs other issues, we don't—we don't see that and don't care."[175] Texas law requires that the insured pay attention to, see, and care about damage attributable non-covered perils and "present some evidence affording the jury a reasonable basis on which to allocate the damage."[176]

Brookes' defense to this argument, essentially burying its head in the sand as to non-covered perils, is equivalent to that of the insured in *Wallis v. United Services Automobile Association.*[177] In *Wallis*, the insured filed a claim under their homeowner's policy for foundation damage they suspected was caused by a plumbing leak.[178] Through its investigation, the insurer determined that the foundation

---

170. Appendix to defendants' responses, vol. III, CC. at 69.

171. Appendix to defendants' responses, vol. III, CC. at 72–73.

172. Appendix to defendants' responses, vol. III, CC. at 75–76.

173. Docket no. 129 at 8, ¶ 21.

174. Appendix to defendants' responses, vol. III, CC. at 69.

175. Appendix to defendants' responses, vol. III, CC. at 72–73.

176. *Lyons v. Millers Cas. Ins. Co. of Texas,* 866 S.W.2d 597, 601 (Tex.1993) (*citing Paulson v. Fire Ins. Exch.,* 393 S.W.2d 316, 319 (Tex.1965)).

177. 2 S.W.3d 300, 303 (Tex.App.-San Antonio, 1999).

178. 2 S.W.3d at 301.

damage was caused by several excluded perils under the insured's policy, including "settlement, poor surface drainage, the topography of the lot, and surrounding vegetation."[179] Plumbing leaks, which were covered perils, were also detected; however, the insurer concluded that the leaks were negligible and had not caused or contributed to the complained-of damage.[180] The insured argued that "the issue of allocation [was] immaterial because the evidence introduced at trial was that the entire house needed to be repaired."[181] The Court rejected this claim holding:

> Because an insured can recover only for covered events, the burden of segregating the damage attributable solely to the covered event is a coverage issue for which the insured carries the burden of proof. Moreover, it follows that an insured's failure to carry the burden of proof on allocation could not be immaterial because it is central to the claim for coverage.[182]

Similarly, Brookes argue that because the entire "monolithic slab" foundation is not level, the entire foundation must be repaired regardless of the cause at any given point.[183] Or, to repair only that which was damaged by the accidental discharge of water means to repair the entire foundation. This is precisely the argument rejected in *Wallis*. "When covered and excluded perils combine to cause an injury, the insured must present some evidence affording the jury a reasonable basis on which to allocate the damage."[184]

In sum, Brookes have failed to rebut evidence (largely from their own experts) that covered and excluded perils combined to create the loss. Brookes have failed to rebut the claim that they have presented no evidence upon which a jury can allocate the damage attributable to the covered peril.

Therefore, it is recommended that plaintiff's motion for summary judgment (allocation) be *granted.*

### D. Whether General Star is entitled to summary judgment as a result of the policy clause excluding coverage for continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more

General Star's motion for summary judgment (14–day) argues that judgment as a matter of law should be entered in its favor under the policy clause providing that General Star "will not pay for loss or damage caused by or resulting from ... continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more."[185] General Star argues that the policy clause excludes defendants' claimed losses because, according to General Star, Brookes' own experts' opinions establish that any water leaks likely occurred over a longer period of time than 14 days, possibly months, resulting in the damage to the property.[186]

179. 2 S.W.3d at 301–2.

180. 2 S.W.3d at 302.

181. 2 S.W.3d at 303.

182. 2 S.W.3d at 303 (citations omitted).

183. Docket no. 129 at 7, ¶ 18. Brookes argue: "to level a foundation, the entire foundation has to be leveled regardless whether mounds or dis-leveling exist in other portions of the foundation .... to repair a foundation damaged by plumbing leaks, the monolithic slab must be addressed." *Id.*

184. *Lyons,* 866 S.W.2d at 601 (*citing Paulson,* 393 S.W.2d at 319).

185. Docket no. 93 at 1–4. As discussed further below, this language is contained in the portion of the policy captioned "causes of loss—special form" (appendix to defendants' responses, vol. 1, A).

186. Docket no. 93 at 3–4, 7. General Star disputes that water leaks, if any, are the sole

Brookes oppose summary judgment on this ground, arguing that the 14–day policy exclusion is inapplicable to the present case because an "exception to the exclusion" in the "causes of loss—special form" portion of the policy controls and provides for coverage for the losses.[187] The "causes of loss-special form" section provides:

> if an excluded cause of loss that is listed in [section B (2)(d)] (1) through (7) results in a "specified cause of loss" ... we will pay for the loss or damage caused by that "specified cause of loss."

The excluded causes of loss that are listed in section B(2)(d) (1) through (7) include:

(1) Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself.

"Specified cause of loss" is defined to include "water damage" which is defined as "accidental discharge or leakage of water or steam as a direct result of the breaking apart or cracking of any part of a system or appliance ... containing water or steam." Read together, the relevant portions of the provisions upon which Brooks rely provide:

> We will not pay for loss or damage caused by or resulting from any of the following .... wear and tear .... rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property .... [b]ut if .... wear and tear .... rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property .... results in .... water damage .... the accidental discharge or leakage of water or steam as a direct result of the breaking apart

or cracking of any part of a system, .... we will pay for the loss or damage caused by that .... water damage.

Brookes, interpreting the policy provisions, argue that "as a result of wear and tear, corrosion, decay, deterioration, or hidden or latent defects, the sewer lines beneath the apartments cracked or broke, directly causing an accidental discharge of water that resulted in the structural damage to the apartments" and, therefore, their losses are covered losses.[188] Brookes contend that the statement "we will pay" in the "exception to the exclusion" is not "limited or qualified" by any exclusion, including the 14–day exclusion, and, therefore, it unambiguously provides for coverage of their loss.[189]

Alternatively, Brookes argue that should the Court find that the 14–day provision is applicable, that the Court should construe it as a notice provision.[190] Brookes argue that a leak under the foundation would not likely be visible within 14 days of the leak's commencement and that to "read the 14–day exclusion as General Star does would require an insured to conduct plumbing tests on all of its pipes in every building of its properties every fourteen days to preserve the benefit of coverage under the policy."[191] Brookes continue that there is no evidence that the leaks began more than 14 days before General Star was first notified of the probability of leaks and that Brookes had previously made repairs to leaks as they were discovered.[192] Brookes further argue that because "causes of loss—special form" section E, "additional coverage extensions," provides that "[i]f loss or damage caused by or resulting

---

cause of the claimed damage. Docket no. 136 at 4; docket no. 91 at 3.

**187.** Docket no. 128 at 3–4.

**188.** Docket no. 128 at 4, ¶ 8.

**189.** Docket no. 128 at 4, ¶ 9, 8, ¶ 16.

**190.** Docket no. 128 at 9, ¶ 18.

**191.** Docket no. 128 at 9, ¶ 18.

**192.** Docket no. 128 at 10, ¶ 19, 20.

from covered water ... occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes," Brookes are entitled to the full cost of repair of the water damaged property.[193]

General Star has cited *General Accident Insurance Co. v. Unity/Waterford–Fair Oaks, Ltd. v. General Star Indemnity Co.,* in support of its construction of the 14–day clause. In *General Accident Insurance,* the Court construed a policy containing a continuous or repeated leakage exception identical to that of this case and ruled that the same construction of that language as that advanced by the Brookes was "unreasonable:" [194]

[T]o determine coverage ... one would have to first determine if the loss was covered under the all risk umbrella. One would then have to determine if any of the exclusions applied to the loss ... one would also have to look to see if the exclusion in Section B(2)(d) applied. If that exclusion applied, one would then have to look at the last sentence of B(2)(d) to determine whether additional coverage has been granted beyond the original scope of the all risks policy.[195]

As the Court in *General Accident Insurance* succinctly concluded, in all cases in which "damage occurs from the leakage or seepage of water over a period of 14 days or more, the damage is not covered—even if that leakage or seepage was caused by rust or corrosion"—a specified cause of loss.[196] This decision is directly on point and binding precedent on the undersigned as to the interpretation of the 14–day clause.

The 14–day clause in Brookes' policy unambiguously [197] excludes from the policy

---

**193.** Docket no. 128 at 4.

**194.** *General Accident Insurance Co. v. Unity/Waterford–Fair Oaks, Ltd. v. General Star Indemnity Co.,* SA–97–CA–624, docket no. 112 at 4–5 (W.D.TX., Dec. 14, 2000).

**195.** *General Accident Insurance,* SA–97–CA–624, docket no. 112 at 5.
An alternative reading of the policy provisions would be that the "exception to the exclusion" does not grant additional coverage or add a separate promise to pay to the all risk umbrella, but merely carves out an area of the broad exclusion to not be excluded. Under Texas law, the preferred interpretation of a policy is one that provides meaning to every provision and does not read any term out of the contract. *Woods,* 273 S.W.2d at 620–21. Texas law provides that after applying the rules of construction, if the contract is subject to more than one reasonable interpretation, the interpretation that most favors coverage will be adopted. *Grain Dealers Mutual Insurance Company v. McKee,* 943 S.W.2d at 458. The Texas Supreme Court has held: " 'The court will not hold that the insurance company did not intend to insure that which it expressly contracted to insure; on the other hand, courts will not so construe plain language as to make a contract embrace that which it was intended not to include.' " *Royal Indem. Co. v. Marshall,* 388 S.W.2d 176, 181 (Tex.1965) (citation omitted). Were § B(2)(d) to be given effect and read together with § B(2)(f), the 14–day exclusion, the net result would be that the policy does not cover loss resulting from (for example) "rust or corrosion," except where that "rust or corrosion" results in "water damage," then that "water damage" will be covered, except where continuous or repeated seepage or leakage occurs for a period of over 14 days. This alternative interpretation of the policy would have no effect upon the recommended disposition of this issue in this case or, it would appear, *General Accident Insurance,* in that the Court in *General Accident Insurance* concluded that in all cases in which "damage occurs from the leakage or seepage of water over a period of 14 days or more, the damage is not covered—even if that leakage or seepage was caused by rust or corrosion." *General Accident Insurance,* SA–97–CA–624, docket no. 112 at 6.

**196.** *General Accident Insurance,* SA–97–CA–624, docket no. 112 at 6.

**197.** *Columbia Gas,* 940 S.W.2d at 589 ("A contract is not ambiguous if it can be given a

any and all otherwise covered water damage when the loss occurs from "[c]ontinuous or repeated seepage or leakage of water that occurs over a period of 14 days or more." The language and intent are clear. Brookes' argument that interpretation advanced by General Star and adopted by this Court in *General Accident Insurance* would be "unconscionable" in that it would require them to inspect their property every 14 days is unpersuasive. The goal of discouraging indolence by the insured in taking remedial steps to limit damage by excluding coverage as specified in the policy, is obvious. Clearly, a situation could occur in which, despite the exercise of due diligence in conducting maintenance and repairs to the property, a leak could go undetected for a period of time long enough for the resulting damage to be outside the scope of the policy. These are not unconscionable terms,[198] but are in fact the terms bargained for by the insured.[199] By its nature, an insurance policy apportions risk—here, the line is drawn at leakage or seepage that occurs for more than 14 days.

Brookes' summary judgment evidence does not establish that any plumbing leaks, if they did commence during the policy period, lasted less than 14 days. Garland Burch, a geotechnical engineer, was questioned as to "how long would it take for the soil to swell ... and cause problems with the building." Mr. Burch testified that "[water leaks] could generally start to move the foundation ... in a relatively short period of time .... you're talking about days ... not months or years."[200]

The first inspection by STTI occurred in the "early or mid-fall of 1997" and uncovered damage to unspecified buildings that was attributed by the inspector to possible plumbing leaks.[201] Brookes contacted STTI and requested that they reinspect the property which was done sometime in either December 1997 or January 1998.[202] General Star was informed of the possible claim January 14, 1998 in a faxed letter from Robert Maxhimer to the agent from which the General Star policy was purchased.[203] In the letter Maxhimer states, "[w]e are currently working on a severe underground plumbing problem at the

---

definite or certain meaning as a matter of law").

**198.** Texas law provides:

'[t]wo types of abuses must generally be present to produce a finding of unconscionability.' First, plaintiffs must show 'procedural abuse' in the formation of the contract, such as a gross disparity in bargaining ability. 'A court may find procedural unconscionability if the plaintiff presents evidence of the seller's 'overreaching or sharp practices' combined with the buyer's 'ignorance or inexperience.' Second, plaintiffs must also demonstrate 'substantive abuse,' or unfairness in the formal terms of the contract. The Fifth Circuit has noted that "[a] court may find substantive unconscionability if the terms of the contract are one-sided or oppressive.' To meet this burden, plaintiffs must show that the terms of their contract with National Union are plainly oppressive."

*Bartley v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 824 F.Supp. 624, 635, (N.D.Tex., 1992) (citations omitted).

**199.** *Bartley,* 824 F.Supp. at 634–35 ("In the absence of any mistake, fraud, or oppression, the courts, as such, are not interested in the wisdom or impolicy of contracts and agreements voluntarily entered into between parties *compos mentis* and *sui juris.* Such parties to contracts have the right to insert any stipulations that may be agreed to, provided that they are neither unconscionable nor otherwise illegal or contrary to public policy.").

**200.** Docket no. 93 at 3–4, exhibit C at 14.

**201.** Docket no. 133 at 4.

**202.** Docket no. 133 at 5.

**203.** Appendix to defendants' responses, vol. I, B at 1.

above property [Casa Linda Apartments]. Not only is the plumbing leaking, the building has moved . . . . I feel that it is best that the insurance company see the problem."[204] Therefore, with regard to the two buildings in question in the Casa Linda Apartments, General Star had notice of Brookes' then on-going attempts to remedy the situation, presumably to stop certain leaks.

Notices of loss dated January 28, 1998, were sent on all three complexes;[205] Brookes contend that these notices have an effect on the liability issue—they do not.[206] Brookes argue, "General Star has offered no evidence that the loss occurred more than fourteen days before the loss was reported to General Star."[207] Whether the loss was reported within 14 days of the commencement of the leakage or seepage is of no consequence. The relevant question is only whether the leakage or seepage occurred for more than 14 days.

Brookes also points to repairs that were conducted on January 22, 1998, which General Star's agent witnessed occurring, as evidence that the leaks were repaired soon after their detection.[208] Again, the pertinent question is not whether General Star's agent saw or had notice of this repair, but only whether there is evidence that the repair stopped the seepage or leakage within 14 days of its commencing. General Star's agent who witnessed the repairs states in her report dated January 23, 1998, regarding the repairs to one building: "In speaking with [Mr. Maxhimer], we learned the unit in question had experienced the blockage on December 31, 1997 . . . . according to Mr. Maxhimer, other plumbing problems with this sink had been successfully cleared in the past . . . . previous attempts to snake the line had resulted in mud coming up, but they had successfully cleared the line during those previous attempts."[209]

The Court cannot agree that the January 22, 1998 repairs on two buildings within the Casa Linda Apartments, even when combined with the testimony of Mr. Burch that water leaks could start to move a foundation in days,[210] create a genuine issue of material fact that plumbing leaks were detected and stopped within the required 14 days so that the exclusion would not apply. With respect to the other damages noted by STTI in the Fall of 1997 on certain buildings within the three apartment complexes which STTI attributed to possible plumbing leaks, it is clear that far more than 14 days transpired after STTI's report and Brookes' contact of General Star. Brookes have not met their burden of showing a genuine issue of material fact that less than 14 days elapsed between the development of a known plumbing leak in any specific building and their contacting General Star.

It is therefore the recommendation of this Court that General Star's motion for summary judgment (14–day) be *granted.*

## E. Whether General Star is entitled to partial summary judgment on its alternative grounds

General Star's alternative motion for partial summary judgment argues that judgment as a matter of law should be

---

**204.** Appendix to defendants' responses, vol. I, B at 1.

**205.** Appendix to defendants' responses, vol. I, B at 4, 5.

**206.** Docket no. 128 at 10.

**207.** Docket no. 128 at 10.

**208.** Docket no. 133 at 5; appendix to defendants' responses, vol. I, B, 2 at 2.

**209.** Appendix to defendants' responses, vol. I, B, 2 at 3.

**210.** Docket no. 93 at 3–4, Exhibit C at 14.

entered in its favor on the following issues: Brookes are barred from recovering any damages associated with damage to foundations; Brookes cannot recover any damages associated with loss or damage to underground systems or pipes; Brookes cannot recover any sums associated with the cost of excavating, filling or backfilling; and Brookes' damages are limited to the difference in market value between its value, as it was on the proven date of loss, and its value on that date if free of only the defects which are covered by the policy of insurance.[211] As discussed further below, Brookes' opposes summary judgment on each of these grounds.

### 1. *Recovery for damage to foundations is not barred; recovery for damage to underground systems or pipes and costs associated with excavating, filling or backfilling is barred*

General Star argues that "[n]ot only does [the policy] exclude certain specified causes of loss, but it also excludes from coverage loss or damage to certain types of property," including foundations, underground systems or pipes and costs associated with excavating, filling or backfilling.[212] In support of this proposition, General Star cites to the portion of the policy which provides in part:

Covered property does not include:

 f. The cost of excavations, grading, backfilling or filling;

 g. Foundations of buildings, structures, machinery or boilers if their foundations are below:

 (1) The lowest basement floor; or

 (2) The surface of the ground, if there is no basement;

 \* \* \* \* \* \*

 m. Underground pipes, flues or drains.[213]

General Star argues both that the foundations in question are underground and not covered and that Brookes' "damage expert ... in his report, has set forth at length the sums sought in this case for damage to the foundation, underground pipes, and related costs of grading, excavating, filling and backfilling. Pursuant to those exclusions in the policy, those portions of the claims should be denied." [214]

Brookes also oppose the summary judgment argument that the claimed foundations are below ground and, therefore excluded from coverage, arguing that General Star has not established that the foundations in question are "below the surface of the ground" such that they fall within the noted exclusion.[215]

General Star's summary judgment evidence does not establish that the foundations in question are "below .... [t]he surface of the ground." Although General Star in its reply in support of its motion for summary judgment refers to "all of the photographs of the property [which] show to the contrary," [216] no photographs were submitted as summary judgment evidence. Further, Mr. Karam, an expert, testified that the foundations in question were on top of the ground:

Q. They [the foundations] don't go down into the ground?

A. They're slab on grade. They're on top of the ground. Your beams are

---

211. Docket no. 97 at 8.

212. Docket no. 97 at 1–2.

213. Docket no. 97 at 3. This portion of the policy is found in the parts captioned "building and personal property coverage form,"

section A(2), "property not covered" (appendix to defendants' responses, vol. I, A).

214. Docket no. 97 at 4.

215. Docket no. 130 at 4–5 ¶ 8,9.

216. Docket no. 135 at 2–3.

cut into the—there's no dirt that's thrown on top of it. It's not a basement. It's designed to be on grade. That's what it's called.[217]

\* \* \* \* \* \*

Q. On grade isn't language use in the policy, is it?

A. It says right here, the lowest basement floor or the surface of the ground. Surface, on grade, same thing. On top of the ground.[218]

Therefore, the motion for summary judgment based on the argument that the foundations in question are below ground should be *denied.*

Brookes also move for summary judgment based on the related argument that costs associated with excavating, filling or backfilling are not covered, citing other portions of the policy which provide:

1. **Covered Property**

 Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.**, and limited in **A.2.**, Property Not Covered; if a Limit of Insurance is shown in the Declarations for that type of property.

 a. **Building,** meaning the building or structure described in the Declarations, including:

 \* \* \* \* \* \*

 (5) If not covered by other insurance:

 (a) Additions under construction, alterations and repairs to the building or structure.[219]

Highlighting the clause "repairs to the building or structure," Brookes appear to read this portion of the policy to state that "repairs," generally are covered.[220] Brookes do not expand on this argument or draw any connection between the cited policy language and the facts of this case.

The Court finds that prospective repairs to covered buildings, to include the excavating, filling or backfilling proposed by Brookes, are not within the scope of the unambiguous provisions of the "building and personal property coverage form," section A(1)(a), captioned "Building." The Court construes the term "repairs" within the above section to refer to completed repairs—establishing that once a repair is completed, that repair is considered to be part of the covered "building." Therefore, the cost of repairs generally are not covered under this section of the policy.

Brookes further argue that plumbing lines are not excluded as a result of the "exception to an exclusion" in a portion of the policy captioned "the causes of loss—special form," section B (2)(d), detailed above, and section E(2) which provides:

2. **Water Damage, Other Liquids, Powder Or Molten Material Damage.**

 If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

Brookes argue that "the more specific water damage provisions control over the general exclusions for pipes"[221] and that

---

217. Appendix to defendants' responses, vol. III, CC. at 131.

218. Appendix to defendants' responses, vol. III, CC. at 131–32.

219. This portion of the policy is found in the parts captioned "building and personal property coverage form," section A(1)(a). Appendix to defendants' responses, vol. I, A.

220. Docket no. 130 at 3.

221. Docket no. 130 at 6.

the cost of accessing plumbing is not excluded because "causes of loss—special form" section E(2) provides for coverage.[222]

"Building and personal property coverage form," section A(2), "property not covered" unambiguously excludes from coverage underground systems or pipes and costs associated with excavating, filling or backfilling. Brookes' argument that coverage is found in the "exception to an exclusion" in the "causes of loss—special form" section B(2)(d), has been rejected by *General Accident Insurance Co. v. Unity/Waterford—Fair Oaks, Ltd.* As discussed above, in *General Accident Insurance,* the Court ruled that a reading of the General Star policy provision to find an "exception to an exclusion" to "provide( ) coverage for loss or damage caused by the accidental discharge or leakage of water" is "unreasonable." [223]

Brookes' reliance upon "causes of loss—special form," section E(2) to support the proposition that the policy covers the cost of accessing plumbing is likewise misplaced. The plain language of E(2) provides that General Star will pay "[i]f loss or damage caused by or resulting from *covered* water or other liquid" has occurred. Coverage under E(2) is predicated upon showing that the damage resulted from covered water damage.

Lastly, Brookes argue that E(2), which states in part, "we will also pay the cost to tear out and replace *any part of the building or structure* to repair damage to the system or appliance from which the water or other substance escapes," provides for the coverage of costs associated with excavating, filling or backfilling. The Court finds that were the accidental discharge of water a covered peril, the plain meaning of the section excludes the costs associated with excavating, filling or backfilling, in that Brookes have not demonstrated that these claimed costs are "part of the building or structure." If the foundations are "slab on grade," as discussed above, and "sit on top of the ground," as Mr. Karam testified,[224] then excavating, filling or backfilling under the slab would not necessarily require "tear[ing] out and replace[ing] any part of the building or structure" as provided for by the policy.

In sum, it is recommended that General Star's alternative motion for partial summary judgment based on the argument that the foundations in question are below ground should be *denied* and General Star's alternative motion for partial summary judgment based on the argument that costs associated with excavating, filling or backfilling are not covered should be *granted.*

## 2. Damages are limited to the difference in market value between its value, as it was on the proven date of loss, and its value on that date if free of only the defects which are covered by the policy of insurance

General Star argues that the portion of the policy captioned "building and personal property coverage form," section E(7), "valuation," limits Brookes' recovery, if

---

**222.** Docket no. 130 at 6–7.

**223.** *General Accident Insurance,* SA–97–CA–624, docket no. 112 at 5.

Brookes' response to General Star's alternative motion for partial summary judgment argues that it is "undisputed that the policy provides coverage for loss or damage caused by the accidental discharge or leakage of water" (docket no. 136 at 2–3). A better reading

of the clause is that suggested by General Star in its reply on the 14–day exclusion motion: "To suggest that there is a water damage exception to a 14–day leak exclusion would rob the exclusion of all meaning" (docket no. 136 at 3).

**224.** Appendix to defendants' responses, vol. III, CC at 131.

any, to actual cash value, that is, the difference between the value of the property immediately before and immediately after the loss and damage.[225] General Star argues, while the policy provides for a replacement cost option, that option is "subject to a number of limitations," in that recovery is capped by the policy limit and limited to the amount actually spent repairing or replacing the property and recovery is not available until the property is actually repaired or replaced.[226] Since Brookes are seeking claims in excess of the policy limits, and have not repaired or replaced the property that is the subject of the claimed losses, General Star argues Brookes' recovery is limited to actual cash value.

Brookes respond arguing that General Star "misrepresents to the Court the nature of the policy provisions."[227] Brookes argue that the policy "provides for both measures of damages and allows the insured party to choose the preferred method of recovery within limitations stated in the Policy . . . . the Policy allows Brookes to use either or both measures of damages."[228] Brookes rely on the portion of the policy captioned "building and personal property coverage form," section G(3), "replacement cost," which provides:

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.

 * * * * * *

c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.[229]

Brookes argues, "[t]o the extent that section [G(3)(d)(2) ] requires the repairs be made 'as soon as reasonably possible after the loss or damage,' the question of whether Brookes could reasonably have affected the necessary multi-million dollar repairs before receiving at least a partial payment under the policy is a question of fact to be determined by a jury."[230]

Texas law provides that "actual cash value . . . is equivalent to, and synonymous with, the market value of the property."[231]

Where the market value is the proper measure of damages, it should be submitted to the jury on the basis of the damaged property's market value immediately before and after the loss. The measure of damages under an insurance contract insuring a dwelling, when the loss is not total, is the difference between the value of the property immediately before and immediately after the loss and damage, but within the amount of the policy.[232]

---

225. Docket no. 97 at 4.

226. Docket no. 97 at 5.

227. Docket no. 130 at 7.

228. Docket no. 130 at 7.

229. Docket no. 130 at 7–8.

230. Docket no. 130 at 9.

231. *Guaranty County Mut. Ins. Co. v. Williams*, 732 S.W.2d 57, 60 (Tex.App.—

Amarillo, 1987) (citing *McInnis v. Brown County Water Improvement Dist. No. 1*, 41 S.W.2d 741, 746 (Tex.App.Austin 1931, writ ref'd)); *see also St. Paul Lloyd's Ins. Co. v. Fong Chun Huang*, 808 S.W.2d 524 (Tex.App.—Hous. (14th Dist.1991) ("Where the insurance contract provides the measure of damages is the actual cash value of the damaged or destroyed property, it is equivalent to a market value measure of damages").

232. *U.S. Fire Ins. Co. v. Stricklin*, 556 S.W.2d 575, 582 (Tex.Civ.App.-Dallas, 1977) (citations omitted).

The language of the "building and personal property coverage form," section E(7), "valuation," unambiguously states:

We will determine the value of covered property in the event of loss or damage as follows:

 a. At actual cash value as of the time of loss or damage.[233]

Section G(3) is similarly unambiguous.[234] Although Brookes' recitations of the policy language are accurate, they are pointedly incomplete. Section G(3)(c) does state: "You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis."[235] But, section G(3)(d) further provides:

We will not pay on a replacement cost basis for any loss or damage:

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

The language of section G(3)(d) does not provide, as Brookes argue, for a jury question of whether "Brookes could reasonably have affected the necessary multi-million dollar repairs before receiving at least a partial payment."[236] Whether Brookes could reasonably have affected the necessary repairs is irrelevant. If Brookes could not afford to undertake the repairs, then the clause providing that Brookes complete the repairs "as soon as reasonably possible" is inapplicable to the facts. Therefore, General Star is not required to pay "on a replacement cost basis for any loss or damage."

In sum, it is recommended of the Court that General Star's alternative motion for partial summary judgment based on the argument that Brookes' recovery, if any, should be limited to actual cash value (that is, the difference between the value of the property immediately before and immediately after the loss and damage), should be *granted.*

### 3. *General Star's claim that Brookes' repair costs are barred a economic waste is inapplicable*

General Star argues that it is entitled to partial summary judgment under the Texas doctrine of economic waste.[237] General Star claims that Brookes' claims are barred because "the repair cost exceed the entire value of the property." In support of this proposition, General Star cites *Hutson v. Chambless,*[238] in which the Texas Supreme Court held:

Where to remedy alleged defects in workmanship and deviations from construction contract would have required not only expenditure of large sums, but would have included rebuilding of foundation, tearing down of brick veneer and rebuilding it with better materials, rebuilding of den, and removing and replacing tile in bathroom, and it was not alleged that contractor intentionally deviated from contract, correct measure of damages was difference in value, if any, between house as constructed and its value had it been constructed according to contract.

The Court has found only cases concerning the measure of damages in a breach of

---

233. Appendix to defendants' responses, vol. I, A, "building and personal property coverage form" at 6.

234. *City of Pinehurst,* 432 S.W.2d at 518.

235. Appendix to defendants' responses, vol. I, A, "building and personal property coverage form" at 9.

236. Docket no. 130 at 9.

237. Docket no. 97 at 7.

238. 157 Tex. 193, 300 S.W.2d 943, 945 (1957).

contract action where this doctrine is applied. However, the holding of *Hutson v. Chambless* was distinguished in *Volkman v. Eakman*,[239] which held:

> [T]he parties here have themselves agreed as to what the measure of damages would be if either one of them later breached the contract. They had a right to make such an agreement. Under the quoted provision of the contract, if the contractor breached the contract, the owner can recover from the contractor the amount that it would reasonably and necessarily cost him to complete the house according to the plans and specifications.[240]

Therefore, to the extent that the doctrine of economic waste is applicable to an insurance policy cause of action where there is an issue of the correct valuation of the loss, where the parties have determined within the policy the measure of the loss, such a contractual agreement under Texas law would preempt the doctrine of economic waste.[241] The Court finds for the reasons stated above that the parties have within the policy unambiguously determined the valuation of the loss as discussed above.

For the reasons stated above, it is recommended that General Star's alternative motion for partial summary judgment with regard to prohibiting Brookes' claimed losses under the doctrine of economic waste should be *denied*.

### F. Whether General Star is entitled to summary judgment as to Brookes' extra-contractual counterclaims

Brookes' first amended answer and original counterclaim alleges that General Star violated the DTPA, the Texas Insurance Code, breached covenants of good faith and fair dealing, committed negligence, committed said acts with malice, and, that the acts of plaintiff constitute a breach of contract.[242] General Star moves for summary judgment arguing that it is entitled to summary judgment as to Brookes extra-contractual counterclaims, because there has been no violation of the contract, because General Star has a reasonable basis for denying Brookes claims, there was no violation of the DTPA and Texas does not recognize a cause of action for negligent claims handling.[243]

In an affidavit from Ron Brunelle, an assistant vice president with General Star Management Company, Mr. Brunelle states that he is responsible for handling claims brought under policies issued by General Star and that he was the claims examiner responsible for Brookes' claims.[244] Mr. Brunelle states that he de-

---

239. *Volkman v. Eakman*, 496 S.W.2d 752 (Tex.Civ.App.-Fort Worth, 1973) *writ refused n.r.e.*

240. *Volkman*, 496 S.W.2d at 758.

241. *Fidelity and Deposit Co. of Maryland v. Stool*, 607 S.W.2d 17 (Tex.Civ.App.-Tyler, 1980) ("Texas courts have consistently allowed parties to a construction contract to agree to use this particular measure of damages for the contractor's failure to comply with the plans. Consequently, appellants cannot complain that the trial court improperly applied the measure of damages for which they agreed in a duly executed contract. Where a contract is clear, unambiguous and incisive, it must stand as written and be enforced accordingly."); *Cf., Starlight, L.P./Xarin Austin I, Ltd. v. Xarin Austin I, Ltd.*, 1999 WL 11213, No Publication, (Tex.App.-Austin, 1999).

242. Docket no. 40 at 8.

243. Docket no. 107.

244. Docket no. 107 at Exhibit A.

Brookes filed a motion to strike the affidavit of Ronald Brunelle on the grounds that it "constitutes hearsay and is purely speculative and conclusory" (docket no. 131 at 2). Mr. Brunelle's affidavit states why General Star denied Brookes' claims. This testimony does

nied the payment of Brookes' claims because, (1) "the loss or damage did not commence within the policy period," and; (2) "[t]he policy exclusion for continuous or repeated leakage or seepage of water for a period of fourteen days or more excluded the loss from coverage." [245]

Brookes respond arguing that, with regard to its common law claim for bad faith, "regardless of whether General Star proves Brookes' claims are not covered, a fact issue remains regarding whether General Star conducted a through and adequate investigation of the claim or whether General Star engaged in a course of conduct designed to arrive at a particular result, *i.e.*, to provide a pretextual basis for the denial of the claim." [246] Brookes further argue that their claims under the DTPA and the Texas Insurance Code survive summary judgment because, "[c]ontrary to General Star's assertions, Brookes' counterclaims do not rest solely on the allegation that General Star misrepresented coverage ... [rather] ... Brookes' claims involve the specific duty to investigate and to pay or deny the claim in a timely manner." [247] Relatedly, Brookes argue that they "are not complaining merely of General Star's denial of the claim ... [but] ... are complaining that General Star delayed 21 months in denying the claim ... failed to conduct an adequate investigation and ... what little investigation was conducted was designed to support a pretextual basis for denial of the claim." [248] In essence, Brookes are

distinguishing their breach of contract claim from their DTPA claim by arguing bad faith.

Both General Star and Brookes rely on *Republic Ins. Co. v. Stoker.*[249] General Star argues that the rule from *Stoker* provides that "[a]s a predicate for any extra-contractual recovery, there must be a finding that the contract has been violated." [250] On the other hand, Brookes argue that "the contractual claim under the policy is independent of the tort claim for bad faith." [251]

In *Stoker* the Texas Supreme Court states:

> An argument has been made that because a policy claim is independent of a bad faith claim, an insured may recover for a bad faith denial of a claim even if the claim is not covered by the policy. We accept the premise of the argument—that a policy claim is independent of a bad faith claim. The asserted conclusion, however, does not necessarily follow. Several cases have been cited to us as support for this conclusion, but none of the cases cited holds an insurer liable for denying a claim not covered by the policy. As we have noted, one element of a bad faith claim is an absence of a reasonable basis for denying or delaying payment of benefits.[252]

*Stoker* holds that, as a general rule, "there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered." [253] Whether the

---

not constitute a "legal conclusion" and is a fact clearly within Mr. Brunelle's personal knowledge. The motion to strike should be *denied.* Mr. Brunelle's affidavit is considered only to establish why General Star denied the claims.

**245.** Docket no. 107 at Exhibit A at 1–2.

**246.** Docket no 131 at 7–8, ¶ 13.

**247.** Docket no. 131 at 10, ¶ 18.

**248.** Docket no. 131 at 9.

**249.** 903 S.W.2d 338, 341 (Tex.1995).

**250.** Docket no. 107 at 3.

**251.** Docket no. 131 at 4.

**252.** *Stoker,* 903 S.W.2d at 340–41 (citations omitted).

**253.** *Stoker,* 903 S.W.2d 338, 341 (Tex.1995).

claims in this case are "in fact not covered" are questions of law addressed at length above, but a recitation of each is not necessary to the resolution of this issue. The *Aranda v. Insurance Co. of North America* test cited in *Stoker* provides that breach of the duty of good faith and fair dealing is established when:

(1) there is an absence of a reasonable basis for denying or delaying payment of benefits under the policy; and,

(2) the carrier knew or should have known that there was not a reasonable basis for denying the claim or delaying payment of the claim.[254]

Here, as in *Stoker*, the analysis ends with an application of the first prong of the *Aranda* test. Whether or not a bad faith claim is independent of the policy claim, and regardless of whether under certain circumstances an insured could maintain a cause of action under Texas state law for bad faith in the face of "a proper denial of coverage," as Brookes assert,[255] is irrelevant in this case. It cannot be said in this case that "there is an absence of a reasonable basis for denying or delaying payment of benefits under the policy."

The "reasonable basis" for the denial of the claims includes the bona fide questions of allocation, commencement, the 14–day exclusion, the coverage of certain property and valuation of the claims—at no point had liability become reasonably clear.[256] The "reasonable basis" for the delay (in the denial of the claims) comes from the ongoing investigations conducted by both parties and the extensive nature of the claims on three apartment complexes with a total of 342 units and 80 buildings[257] and a total claimed loss of $27,065,866.[258]

The breach of the duty of good faith and fair dealing in the context of insurance settlement practices may also constitute a violation of the DTPA and Insurance Code.[259] The DTPA provides for a private remedy for conduct prohibited in any of the specified violations of the "laundry list," and also for "the use or employment by any person of an act or practice in violation of Article 21.21, Texas Insurance Code ...."[260] The Texas Insurance Code addresses unfair claim settlement practices in article 21.21, including, "[n]ot attempting in good faith to effectuate prompt, fair, and equitable settlements of claims submitted in which liability has become clear."[261]

General Star argues in sum:

[D]efendants fail to allege, or have any summary judgment evidence of any separate and independent wrongful conduct violative of the [DTPA] or the Insurance Code, and secondly fail to allege or have any summary judgment evidence of an injury, distinct and apart from their claimed damages from breach of the insurance contract. Without a separate tort and separate claim, no statutory violation has occurred.[262]

---

254. *Stoker*, 903 S.W.2d at 340 (citing *Aranda*, 748 S.W.2d 210, 213 (Tex.1988)).

255. Docket no. 131 at 4.

256. *See Thrash v. State Farm Fire & Cas. Co.*, 992 F.2d 1354, 1356 (5th Cir.1993) (the duty of good faith and fair dealing in the context of insurance settlement practices "is breached by the insurer's failure to pay promptly an insured's claim when liability becomes reasonably clear.").

257. Docket no. 146 at 4 n. 5.

258. Appendix to defendants' responses, vol. II, F.

259. *Thrash*, 992 F.2d at 1356.

260. Tex. Bus. & Com. Code Ann. § 17.50(a)(3) & (4); *Thrash*, 992 F.2d at 1356.

261. Tex. Ins. Code Ann. Art. 21.21 § 4(10)(ii); *Thrash*, 992 F.2d at 1357.

262. Docket no. 107 at 8.

Brookes respond by arguing that the "evidence in this case shows that [plaintiff] repeatedly delayed processing and investigating Brookes claim and when [plaintiff] performed [an] investigation it was inadequate and conducted in a manner designed to support a pretextual basis for denial of the claim." [263] But, Brookes have cited no summary judgment evidence to demonstrate these claims. Later, in support of the argument that Brookes' "experts did discover evidence tending to undermine General Star's theory," Brookes cite to the reports of Schneider, Burch and Fite; [264] but, an examination of those documents finds no evidence that would tend to refute General Star's arguments of allocation, commencement, the 14–day exclusion, the coverage of certain property or the valuation of the claims. These reports generally sum up the damage to defendants' property and conclude that damage was cause to some extent by possible plumbing leaks, not excluding other causes; the reports do not address the commencement issue nor the 14–day exclusion nor the coverage or valuation issues.

The Court in *Thrash* concluded:

There is no evidence that a more thorough investigation would have uncovered evidence affirmatively disproving [the insurer's basis for rejection of the claim], nor is there any indication that a more thorough investigation would otherwise have undermined [the insurer's] basis. [265]

Similarly, the Court must conclude that there is no evidence that a more thorough investigation would have uncovered evidence affirmatively disproving General Star's basis for rejecting Brookes' claim nor is there any indication that a more thorough investigation would otherwise have undermined General Star's basis for the denial of the claims.

To the extent that Brookes DTPA claim may not be predicated upon Article 21.21, Texas Insurance Code, the rule applies that failure to perform the terms of a contract, without more, is not a misleading, false, or deceptive act under § 17.46.[266] When the "essence of the allegations is that: (1) defendants represented that they would perform under the contract, and (2) nonperformance means that they misrepresented that they would perform under the contract," the DTPA has not been violated and the proper recourse is a breach of contract cause of action.[267]

With regard to General Star's motion for summary judgment on Brookes' negligence claims, Brookes "agree that Texas does not recognize a cause of action for negligent claims handling .... Brookes therefore withdraw[ ] their claim for negligence." [268]

Therefore, it is recommended that General Star's motion for summary judgment as to defendants' extra-contractual counter claims should be *granted.*

**263.** Docket no. 131 at 8.

**264.** Docket no. 131 at 9.

**265.** *Thrash,* 992 F.2d at 1358.

**266.** *Helms v. Southwestern Bell Tel. Co.,* 794 F.2d 188, 191 (5th Cir.1986) (claim of errors in yellow pages advertisement did not state DTPA cause of action because " 'misrepresentation' alleged by the Helmses was nothing more than Southwestern Bell's failure to perform its promise to correctly print the ad."); *Crawford v. Ace Sign, Inc.,* 917 S.W.2d 12, 14 (Tex.1996) (same); *Ashford Dev., Inc. v. US-Life Real Estate Serv.,* 661 S.W.2d 933, 935 (Tex.1983) (failure to find satisfactory lender, as promised, was not DTPA violation).

**267.** *Crawford,* 917 S.W.2d at 14.

**268.** Docket no. 131 at 10, ¶ 19.

## VII. *RECOMMENDATION*

In sum, it is recommended that:

General Star's objection to Schneider's affidavit based on the argument the affidavit is in "direct contradiction to prior deposition testimony" [269] should be *overruled*, but General Star's arguments will be considered when assessing the weight, but not the admissibility, of the affidavit; General Star's objections to the affidavits of Lampkin and Martinez on the ground that they are in "direct contradiction to prior deposition testimony" [270] should be *overruled*; General Star's objections and motions to strike Schneider's affidavit based on the argument that the affidavit provides insufficient factual support for its key opinions [271] should be *granted*; Brookes' motion to strike General Star's replies [272] should be *denied*; Brookes' alternative motion to file a supplemental response to the replies [273] should be *granted in part* and the Court has considered the arguments in the supplemental response that respond to the objections to evidence and motions to strike presented for the first time in General Star's replies and in all other respects, the motion should be *denied* and the arguments in the supplemental response that are in the nature of a sur-reply have not been considered in the preparation of this report; General Star's alternative motion to file a reply to defendants' response, to the extent the alternative motion is an after-the-fact request for leave to file the reply briefs that Brookes seeks to strike,[274] should be *granted* and in all other respects, *denied*; General Star's motion to file a reply to Brookes' supplemental response [275] should be *granted in part and denied in part* and the Court has considered those portions of the tendered replies that address the objections to evidence and motions to strike and in any other respect, the motion should be *denied*; General Star's objections to the Reliable Reports, Inc. report [276] are *overruled*.

General Star's motion for summary judgment (commencement) [277] should be *granted*; General Star's motion for summary judgment (allocation) [278] should be *granted*; General Star's motion for summary judgment (14–day) [279] should be *granted*; General Star's alternative motion for partial summary judgment [280] should be *denied* with regard to the exclusion for below-the-surface foundations, should be *granted* with regard to the coverage of underground systems or pipes and the costs associated with excavating, filling or backfilling, should be *granted* to limit Brookes' recovery, if any, to actual cash value (the difference between the value of the property immediately before and immediately after the loss and damage), and should be *denied* with regard to prohibiting Brookes claimed loss under the doctrine of economic waste; General Star's motion for summary judgment as to Brookes' extra-contractual counterclaims [281] should be *granted*; Brookes' mo-

269. Docket no. 138 at 2.

270. Docket no. 138 at 2.

271. Docket nos. 137 at 2–5 and 138 at 2–4.

272. Docket no. 140.

273. Docket no. 140 at 2.

274. Docket no. 141 at 3.

275. Docket no. 143.

276. Docket no. 148 at 2.

277. Docket no. 92.

278. Docket no. 91.

279. Docket no. 93.

280. Docket no. 97.

281. Docket no. 107.

tion to strike the affidavit of Ronald Brunelle[282] should be *denied;* and the parties' respective requests for an oral hearing on the motions for summary judgment or related pleadings[283] should be *denied.*

Any and all other requested relief not herein expressly granted should be *denied.*

## VIII. *INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO OBJECT/APPEAL*

The United States District Clerk shall serve a copy of this Memorandum and Recommendation on each and every party either (1) by certified mail, return receipt requested, or (2) by facsimile if authorization to do so is on file with the Clerk. According to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), any party who desires to object to this report must serve and file written objections to the Report and Recommendation within 10 days after being served with a copy unless this time period is modified by the District Court. A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections. **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate Judge.** A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a de novo determination by the District Court.[284] Additionally, any failure to file written objections to the proposed findings, conclusions and recommendations contained in this Report and Recommen-

dation within 10 days after being served with a copy shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.[285]

March 16, 2001.

## *APPENDIX*

The parties' summary judgment proof includes the complete policy in question (*see* appendix to defendants' responses, vol. I, A; docket no. 92 (plaintiff's motion for summary judgment (commencement)), Exhibit A). For ease of reference in connection with this report and recommendation, selected portions of the policy are set forth below:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM** [00 10 06 95]

\* \* \* \* \* \*

### A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premise described in the Declarations caused by or resulting from any Covered Cause of Loss.

#### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, **A.1.,** and limited in **A.2.,** Property Not Covered; if a Limit of Insurance is shown in the Declarations for that type of property.

a. **Building,** meaning the building or structure described in the Declarations, including:

\* \* \* \* \* \*

---

**282.** Docket no. 131 at 2.

**283.** Docket no. 142 at 1 n. 1.

**284.** *See Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 472, 88 L.Ed.2d 435 (1985).

**285.** *Douglass v. United Services Automobile Ass'n,* 79 F.3d 1415, 1428 (5th Cir.1996).

(5) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the building or structure;

\* \* \* \* \* \*

### 2. Property Not Covered

Covered property does not include:

\* \* \* \* \* \*

f. The cost of excavations, grading, backfilling or filling;

g. Foundations of buildings, structures, machinery or boilers if their foundations are below:

(1) The lowest basement floor; or

(2) The surface of the ground, if there is no basement;

\* \* \* \* \* \*

m. Underground pipes, flues or drains;

\* \* \* \* \* \*

### G. OPTIONAL COVERAGES

If shown in the Declarations, the following Optional Coverages apply separately to each item.

\* \* \* \* \* \*

### 3. Replacement Cost

a. Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.

\* \* \* \* \* \*

c. You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

d. We will not pay on a replacement cost basis for any loss or damage:

(1) Until the lost or damaged property is actually repaired or replaced; and

(2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

\* \* \* \* \* \*

## CAUSES OF LOSS—SPECIAL FORM
[10 30 06 95]

\* \* \* \* \* \*

### A. COVERED CAUSES OF LOSS

When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

1. Excluded in Section **B.**, Exclusions; or

2. Limited in Section **C.**, Limitations; that follow.

### B. EXCLUSIONS

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

\* \* \* \* \* \*

b. Earth Movement

(1) Any earth movement (other than sinkhole collapse), such as an earthquake, landslide, mine subsidence or earth sinking, rising or shifting. But if earth movement results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

\* \* \* \* \* \*

2. We will not pay for loss or damage caused by or resulting from any of the following:

\* \* \* \* \* \*

d. (1) Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

\* \* \* \* \* \*

(4) Settling, cracking, shrinking or expansion;

\* \* \* \* \* \*

But if an excluded cause of loss that is listed in **2.d.(1)** through (7) results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

\* \* \* \* \* \*

f. Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more.

\* \* \* \* \* \*

## E. ADDITIONAL COVERAGE EXTENSIONS

\* \* \* \* \* \*

2. **Water Damage, Other Liquids, Powder Or Molten Material Damage.** If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

\* \* \* \* \* \*

## F. DEFINITIONS

"Specified Causes of Loss" means the following:

\* \* \* \* \* \*

water damage.

\* \* \* \* \* \*

3. Water damage means accidental discharge or leakage of water or steam as a direct result of the breaking apart or cracking of any part of a system or appliance (other than sump system including its related equipment and parts) containing water or steam.

\* \* \* \* \* \*

## COMMERCIAL PROPERTY CONDITIONS [00 90 07 88]

\* \* \* \* \* \*

## H. POLICY PERIOD, COVERAGE TERRITORY

Under this Coverage Part:

1. We cover loss or damage commencing:

a. During the policy period shown in the Declarations; and [ . . . . ]